The appealing defendant and his co-defendants, Ward M. Blanton and Vivian Baird, were tried on an indictment charging them with conspiracy to procure persons "to commit wilful and corrupt perjury before the courts of the State of North Carolina" and that "they did combine, conspire and confederate, and plan together amongst themselves each with the other and with each other to suborn of perjury and for corrupt bargaining and contracting with others to commit wilful and corrupt perjury and procure false testimony to be given wilfully and corruptly knowing the same to be false and they knew and believed that such testimony would be false and knowing that the persons suborned would wilfully and corruptly give false testimony and that they, the said Ward M. Blanton, Vivian Baird and W. T. Shore, induced and procured said persons to give false testimony in actions before the Courts of the State of North Carolina and did, in fact, procure through such unlawful, wilful, wicked, deceitful and felonious conspiracy succeed in having perjury committed in the Courts of the State of North Carolina, to-wit:"
There follow 10 numbered paragraphs in each of which the charge of conspiracy is repeated, with specific references to 2 incidents of overt accomplishment, causes in which the perjuries are alleged to have been committed, the nature of the perjury, particulars of procurement, and concerted action.
The conspiracy alleged was in connection with actions brought in Mecklenburg Superior Court in a wholesale scheme to obtain divorces for persons actually residing out of the State, and principally, or wholly, within the State of South Carolina. The perjury referred to in the indictment relates to false proof of North Carolina residence requisite to procure a divorce here, both as a matter of evidence and pleading.
The defendants moved to quash the indictment on the ground that it was not found on competent testimony; and that it failed to charge the commission of a crime. The motion was overruled in both respects.
The defendant pleaded not guilty and the trial proceeded. During its course a plea of nolo contendere was accepted from the defendant Baird. Blanton and Shore were convicted, but only Shore appealed.
In general outline the evidence points to the office of Colonel T. L. Kirkpatrick, a prominent attorney of Charlotte, now deceased, as the headquarters of the defendants Blanton and Baird in organizing and handling the divorce business referred to in the indictment and alleged to be illicit. Colonel Kirkpatrick was entirely disabled, later died, and is not chargeable with participation in the enterprise. Blanton, not a practicing attorney, had occupied the office subsequent to the disablement of Col. Kirkpatrick. Vivian Baird was a secretary in the office, holding *Page 519 
a commission as Notary Public. W. T. Shore, a practicing attorney, handled the court end of the business, receiving the complaints or pleadings prepared in the office, going over them in pretrial conference with clients, presenting the cases and examining the clients and witnesses on the hearing, and performing all the offices of actual attorney and attorney of record as required. The evidence discloses that many cases were tried and disposed of before interference by the S. B. I. brought the activities to a close. The defendant Shore received ten dollars per case, paid usually by Blanton, but not directly received from the clients represented. Blanton received sums varying from $100 to $150 or more per case.
From this office direct solicitation of clients was made in extensive territories in South Carolina, both by Blanton and persons employed by him; and through clients and otherwise the business was advertised, and the fact that divorces could be obtained from the North Carolina Courts through the facilities of the office, regardless of the fact that applicants were not residents of the State.
Oscar E. Sells, testifying for the State, testified that he had gotten in trouble about gasoline coupons and Blanton accompanied him to Washington to see "various Senators and Congressmen." After his conviction and service of a six months term he came to Charlotte to see Blanton who engaged him to ride over the country with one Isadore Groskin to sell oil stock. Vivian Baird was employed in Blanton's office. Witness drove Blanton to South Carolina on several occasions and went down there and solicited business for the office. People from South Carolina would come up and get divorces. Blanton was giving him money to eat on, his car when he wanted it, and a commission on all the business he brought in. At one time he took Blanton and Vivian Baird to Rock Hill and they sent him over to see Evelyn Barr, and her sister, Thelma Chassereau, to see what could be worked out in getting some divorce cases. He did see them and the two sisters rode all over Rock Hill to see their friends who wanted divorces. Witness went down to Rock Hill on two other occasions and called on people, leaving the address and phone number of Blanton's office with a pawn broker who was to advise all those at the Finishing Plant who wanted divorces how they could get "fixed up."
One Pearlie Steedly came up from Fort Mill and got her divorce through the Blanton office. Witness' wife was required to testify as to the residence. Shore represented Pearlie Steedly, "but Mr. Shore was not supposed to know anything about it, only except just like it was legal, and everything. Mr. Shore did not know anything about it but what the lady had lived in North Carolina all her life. Blanton told Mrs. Steedly what to say, where to establish her residence, how to do and what to do. Mrs. Steedly had her legal residence in Fort Mill, South Carolina." She obtained the divorce. *Page 520 
On the trip with Blanton and Baird, Blanton, in the presence of Mrs. Baird, Mrs. Barr and Mrs. Chassereau, said that "there were literally thousands of divorce cases in South Carolina, and all we had to do was to contact the people and get them up there and we would get our commission on each divorce." Soon afterward he saw Mrs. Barr and Mrs. Chassereau in Blanton's office. They were getting a divorce for Mrs. Chassereau "on account of her husband being in the service and she hadn't seen him for three or four years."
Witness stated that Blanton offered Mrs. Sells $10.00 a case for establishing legal residence in North Carolina for non-residents applying for divorces through his office, and on one occasion gave her $10.00 — in the Steedly case. He said that since the indictments were filed Blanton had menaced him in various ways to prevent him from testifying in the case.
This witness' wife corroborated her husband as to part of his testimony. She further testified that some of the plaintiffs were cautioned not to let Mr. Shore know anything about residence, that he was just going to try the case. That she was in the courthouse and testified in the Doris Williams case, but did not have to tell a lie.
Evelyn Barr (mentioned in Section 4 of the indictment as having obtained a divorce as the result of the conspiracy) testified that she lived at Rock Hill, South Carolina, had lived at the address for over a year. That she sued for a divorce in Mecklenburg Superior Court. The complaint was prepared by Blanton, who signed Mr. Shore's name to it. Shore was not in the office at the time. The paper was notarized by Mrs. Baird. (It shows Mrs. Barr verified the complaint which alleges her residence to have been in North Carolina for the requisite period.) That she later met Mr. Shore in Blanton's office and asked him if it would be all right to go through with that divorce, knowing that she lived in the State of South Carolina, and he said "yes," and she proceeded to a hearing before Judge Hamilton. She paid Blanton either $135 or $137 for legal services.
The witness stated that after the indictment both defendants Baird and Blanton came to see her and menaced her in an attempt to keep her from court. Blanton tried to frighten her, and she threatened to call the local police. He later gained entrance to her home and told her she wouldn't like to come up missing at work, and threatened violence to her sons; later threatened to have her arrested if she came into the courtroom.
On cross-examination she stated that on the trial she swore that she was a resident of North Carolina upon the advice of her "so-called" attorney; that she did not hire Shore and has never paid him anything. That Blanton told her and her sister what to say in court upon the trial that day and said, "Is that right, Bill?", and Mr. Shore said "Yes." That Shore did not tell them what to go to court and swear, Mr. Blanton *Page 521 
told them what to say. Mr. Shore did ask her how long she had been separated from her husband. That was the first time he had ever asked anything about the subject.
Mrs. Chassereau (mentioned in paragraph 8 of the indictment as having obtained a divorce through Blanton's office and the appearance in court of Shore) testified that she was sent up there through a girl who had gotten a divorce through the Blanton office, and met Blanton and Baird, but did not see Shore at the time. Both Blanton and Baird knew that she was not a resident of North Carolina. She paid Blanton and Baird for getting the divorce. She had before started suit for divorce but that case was thrown out of court and she began anew with Blanton and Baird. The witness stated that she did not tell defendant Shore that she was a resident of South Carolina; that she, with several other applicants for divorce, saw Shore on February 18, the day she got her divorce, and Shore talked to all of the girls present. He asked if they were sure that they had been separated from their husbands for two years and this witness told him, "yes." Shore said that was all he wanted to know. He did not ask her anything about where she lived.
Virginia Herndon Collins (not mentioned in the indictment) was offered as a witness by the State on the question of scienter as having obtained a divorce through the Blanton office under similar circumstances and upon similar perjury. After cautioning the jury with respect to this evidence and confining it to the purpose for which it was offered, she was permitted to testify. She stated that she got her divorce on the ground of two years separation and paid Blanton $100 in two payments, and $7.00 at another time. Shore handled the case in court.
Blanton told her beforehand that she would have to have a witness to say that she had lived in North Carolina for six months; that this was the main thing, and gave her instructions about this witness. Fred Collins testified for her that she was a resident of North Carolina, but she was a resident of South Carolina and had been living in South Carolina all her life. Witness stated that she saw Mr. Shore sign the complaint and write in the word "continuously" as to the residence in North Carolina. Prior to the hearing Mr. Shore asked her if she had been separated from her husband for two years and asked her if she had been a resident of the State of North Carolina for six months and she told him she had.
Nell Roach (referred to in Section 6 of the indictment) testified that previously Blanton came to her house with regard to getting a divorce. That she lived in Rock Hill, South Carolina, and had never lived in North Carolina. Subsequently Blanton called her and told her he had the papers ready but witness told him she was not ready to sign. Then he told her it would be absolutely all right, that he had gotten 100 of them and one of them had not come back yet; and she signed in the *Page 522 
presence of Blanton and Baird, paying Blanton at one time $30.00 and at another time $85.00. Mr. Shore represented her as attorney in the courtroom. He asked her questions but did not ask her where she resided.
After she had gotten her divorce Blanton came to see her twice and told her he was expecting some men down there and for her to keep her mouth shut. Shore was in Blanton's office when she paid Blanton $85.00.
Lois Keels testified that she obtained her divorce through Blanton's office and that Shore represented her in the court. In her complaint she swore that she had been for six months a resident of North Carolina, whereas, in fact, she was a resident of South Carolina. She first saw him the morning of the divorce.
Various exhibits were introduced by the State, including the judgment rolls in several of the cases, to which reference is made in the indictment and in the evidence, and several receipts for money paid Blanton in connection with the divorces and particularly receipt for money on which Blanton had signed the name of defendant Shore.
The defendant W. T. Shore, testifying for himself, stated that Colonel Kirkpatrick had been a close friend of his. That he had known Blanton as the Colonel's secretary for several years and that Blanton asked him if he could handle the cases in the office for trial that the Colonel had started; and that he told Blanton he could not let the Colonel down in his sickness. He asked Blanton what trial fee he would pay and that Blanton said that he had been paying Price $10.00 for each divorce. That Colonel Kirkpatrick had to have a living out of it and the minimum fee was $25.00; and that on this basis he undertook to try the cases that Kirkpatrick already had in court.
That Blanton told him he had Kirkpatrick's forms for simple uncontested divorce cases on grounds of two years separation and it was just a matter of filling in the dates; that he did not have to draw any of the papers or come into the case except on the day of the trial. Therefore, whenever Blanton phoned him that he had a divorce case for settlement, which had already been duly verified, and when the cases appeared to be regular, he would sign the papers, take the complaint down and file it. That he never had anything to do with the case or cases in divorce matters till the day of the trial. That he received $10.00 for each case, which fee was paid to him when he took the papers down to file them; that was all he ever received for any of the cases named in the bill of indictment. He stated further that he questioned each client both as to the fact of separation and residence and never had the slightest idea that any one of them was not a resident of the State of North Carolina.
Witness did not remember any conversation with Evelyn Barr when Blanton asked him in her presence, "Isn't that right Bill?" with reference to what Blanton had told them to swear. The witness denied that he had anything to do with rounding up cases or soliciting clients in *Page 523 
divorce cases; said that he had never heard Blanton claim to be a lawyer.
The defendant demurred to the evidence and moved for a judgment of nonsuit as required by the statute.
Objections to the instructions to the jury pertinent to decision will be noted in the opinion.
The jury found the defendant W. T. Shore "guilty as charged in the bill of indictment," recommending mercy. Defendant moved to set aside the verdict for errors committed on the trial, which motion was declined, and defendant excepted. The defendant moved for an arrestment of judgment, which was refused, and defendant excepted. Thereupon he was sentenced to Central Prison for a period of not less than three nor more than seven years, to work as provided by law. The defendant appealed, assigning errors.
The unusual volume of evidence and number of objections to the indictment, admission of evidence, and the charge of the court, render it impossible to take up defendant's exceptions by number, although they have received careful consideration. The discussion here must necessarily be topical, and in summary, if we avoid the creation of a volume equal to that with which we are dealing. The exhaustive and able argument of counsel for the appellant and the equally thorough response of the Attorney-General have raised many questions which we cannot discuss at any length. We confine ourselves to a discussion of those points upon which the appellant seems to rely more strongly for his relief.
In appellant's brief the motion to quash the indictment is succinctly put on two grounds; first, that it was found wholly on hearsay and incompetent evidence; second, that it fails to charge a crime, and is too vague or wanting in substantial averments to give the accused the information necessary for his defense or protect him against subsequent prosecution. In support of the first objection the defendant undertook to put on W. I. Gatling and Edward L. Cannon, claimed to be the only witnesses examined by the grand jury. Their testimony was rejected. No other evidence was tendered. Conceding that an indictment is subject to be quashed when founded solely upon incompetent evidence (State v. Coates, 130 N.C. 701,41 S.E. 760; State v. Moore, 204 N.C. 545, 168 S.E. 845; State v.Deal, 207 N.C. 448, 177 S.E. 332; State v. Beard, 207 N.C. 673,178 S.E. 242), yet public policy in this State will not permit an examination of the witnesses testifying before the grand jury *Page 524 
in order to show the nature and character of evidence upon which the bill was found. State v. Levy, 200 N.C. 586, 158 S.E. 94; State v. Dixon,215 N.C. 161, 1 S.E.2d 521; State v. Dale, 218 N.C. 625,12 S.E.2d 556.
To fully understand the second objection we must refer to the theory of the case on which it is advanced. The brunt of the attack is made on the "unnumbered" first paragraph of the indictment on the theory that some rule of law, not clearly stated, requires that the indictment shall be analyzed into 11 parts, each of which is to be considered as a count, the main charge of conspiracy being included in the first unnumbered paragraph. If that were true, many of the references in this paragraph would be too vague to survive the attack since, taken alone, not only are many of the essential averments not present, but the trial court and the accused himself might be left in doubt as to the objective of the conspiracy, — what was intended to be accomplished by it. But taken as a whole the objection loses point. While each of the ten numbered paragraphs formally repeat the charge of conspiracy they are sufficiently definite and complete in the particulars claimed to be wanting in the unnumbered paragraph as to contain all the substantial averments necessary to conviction. The trial court construed it as a one-count indictment with the ten numbered paragraphs intended as specifications of particulars omitted from the first and we are of the opinion that his interpretation is not only consistent with the grammatical expression and connection within the bill itself, but is a reasonable and proper legal construction. It certainly was not the intention of the indictment to charge eleven independent conspiracies, and the formal restatement of the fact of conspiracy in each of them does not destroy the continuity. The type of conspiracy to which the indictment is aimed was broader in its purposes than the separate instances in which the overt acts were specified, together with the particular overt instances in which the suborned perjury was used, its character and its purpose. The indictment was, to use the vernacular, intended to charge a conspiracy to run a wholesale divorce mill with perjured testimony as to residence as its mode of operation. The indictment is singularly like a preview of the evidence in the case. The appeal made by the syndicate was to residents of South Carolina, where divorces are not obtainable.
It might have been differently worded and organized, it is true, but we do not find in it any essential defect that is not cured by our statute of jeofailes, G.S. 15-153. Taken as a whole, it fairly charges the crime intended and was sufficient to put the accused to his defense. We do not find wanting any substantial averment of fact or circumstance necessary to support the indictment.
It was not necessary for the indictment for conspiracy to describe the subject crime with legal and technical accuracy. State v. Dale, supra; *Page 525 Williamson v. U.S., 207 U.S. 425, 52 L.Ed.., 278; see also 15 C. J. S., "Conspiracy," p. 1112, ss. 80, 85; as to subornation of perjury see G.S.14-210; and as to the crime itself, see G.S. 14-209. State v. Ritter,197 N.C. 113, 147 S.E. 811; State v. Lea, 203 N.C. 13, 164 S.E. 737;State v. Abernethy, 220 N.C. 226, 17 S.E.2d 25; State v. Smith,221 N.C. 400, 20 S.E.2d 360. The crime charged is the conspiracy — not perjury or the subornation thereof.
Most of the exceptions to the evidence relate to the principle that the acts and declarations of an alleged co-conspirator are not admissible in evidence against another charged with participation in the conspiracy unless there is some evidence connecting the latter with the conspiracy; and then only such declarations and acts as are in furtherance of the common purpose, and occur while the conspiracy is still in progress. Statev. Wells, 219 N.C. 355. Of that character are objections to many exhibits of the State, particularly the receipts given by Blanton for money paid him in connection with the divorces. In one instance such a receipt bears the name of W. T. Shore, signed by Blanton. An examination of the record, however, discloses that when these exhibits were introduced there was other evidence engendering legitimate inferences of Shore's connection with the conspiracy, as will be seen by further reference. The trial judge was careful in protecting the defendant's rights in this respect. It may be observed here that the rules to which we have referred have nothing to do with the order of introduction of evidence. The difficulties of proving conspiracy are notorious but evidence of the declaration or act of a co-defendant in the furtherance of the object of conspiracy will not be excluded if evidence aliunde shows the participation. State v. Dale, supra.
The several objections to the charge of the court are in many instances so connected with defendant's demurrer to the evidence and motion for judgment as of nonsuit that separate discussion would be repetitious.
The evidence relied upon to convict the appealing defendant was largely, but not wholly, circumstantial. There is in this case "a development and connotation of circumstances" which seem to justify consideration by the jury. United States v. Glasser, 315 U.S. 60, 80; United States v. Manton, 107 F.2d 824, 839; Direct Sales Corp. v. United States,319 U.S. 703, 87 L.Ed.., 1674. The validity of inferences of his guilty participation in the conspiracy he so much aided and to the success of which he was indispensable, drawn from the long association with Blanton and Baird, and their South Carolina clientele, and daily contacts made in the workshop where the frauds were devised, and the number of appearances made by him as an attorney from day to day in guiding these fraudulent cases to a successful issue in the court, — inferences of participation arising from these facts would scarcely be questioned except from the recurrence in the State's evidence of *Page 526 
statements by several of the witnesses that Shore was not told of the falsity of the claim of residence, or that he was not supposed to know, or that witnesses were told not to tell him about it. Thus is uncovered a peculiar but apparently necessary feature of the conspiracy, and upon it the inquiry arises: Whether, as contended by the defendant Shore, a practicing attorney of, we must assume, at least ordinary acumen, piloted through the dangerous channels of the court, upon his own admission, upwards of 30 fraudulent divorce cases — (other evidence suggests 100) — in each of which there was a pre-conference with the client, and to the end he was kept ignorant of the facts, an innocent dupe of the ring; or, upon an alternative view, that a spurious appearance of innocence on the part of Shore had to be maintained in dealing with the court in the critical process of judicial investigation, and was itself conspiratorial.
The trial judge gave it as a contention of the State that the latter view prevailed in the alleged prosecution of the aims of the conspiracy, and that the State relied upon it as one of the constituent factors of the scheme. In the exception to the bracketed portion of the charge dealing with this feature we find the brunt of the objection to the judge's instructions, and we forego discussion of others offering less serious challenge to the result.
The circumstance pointed out, — consistent recurrence in the office of Blanton of the understanding that the falsity of the claim of residence should not be made known to Shore, — had its fitting counterpart in the behavior of Shore, — not perfect perhaps in role, but nevertheless so present as to betray a sensitivity on that point, — when he sometimes examined the applicants as to the truth of the allegations as to two years separation and seemingly avoided the equally important question of residence, upon which the whole conspiracy depended.
Shore was not merely a "front," an apple-peeling colonel of plausible appearance, sitting in the front office to give an air of respectability to the operations of Gentle Grafters in an O. Henry story. He was literally the mouthpiece of the setup — the one means of entrance the Blanton office had to the courts of justice, with their traditional standards of respectability and canons of rectitude. A mishap in that department, which might easily occur, would put an end to the fraudulent scheme, destroy both the conspiracy and the conspirators.
Whether the inferences may be strong or weak, it is not our office to say. The whole circumstances surrounding the actors and bearing upon their alleged conspiracy, the acts and declarations of those engaged in it and their interdependence are legitimate subjects for consideration by the jury. And we do not find that the pertinent passages in the charge are to be held for error. It is to be noted here, however, that in two instances the rule apparently imposed upon the witnesses not to speak to Shore of the fact of their South Carolina residence broke down. Mrs. *Page 527 
Barr testified that in the presence of Blanton and Baird and others in the office just prior to the hearing of her case in court, she asked Shore whether it would be all right to proceed with the trial knowing that she lived in South Carolina. He answered, "Yes." At another time Blanton was telling them "what to swear," — turned to Shore with the question, "Isn't that right, Bill?", and Shore replied, "Yes." These expressions must be taken in the light of the circumstances under which they were made. We cannot say that they are free from inferences tending to show a knowledge on the part of Shore of the unlawful nature of the acts in which he was engaged, and his guilty participation in the conspiracy. We do not mean by this reference to evidence specifically challenged, to suggest that it stands alone. The evidence which we find no necessity of analyzing,arguendo, is ample to support conviction. The disbarment of the defendant followed as a legal consequence of his conviction.
We do not find in the record or in the exceptions of the appellant, which we have carefully considered, any sound reason for disturbing the result of the trial. We find
No error.