STATE OF NORTH CAROLINA v. ANTHONY DOUGLAS CAREY

No. 16

(Filed 1 July 1974)

1. **Conspiracy § 6— conspiracy to rob — defendant not participant in robbery**

    The State's evidence was sufficient to be submitted to the jury on the issue of defendant's guilt of conspiracy to commit armed robbery where it tended to show that defendant and four others planned a service station robbery on the day prior to the date it was attempted, that defendant rejected a suggestion that he go with one of the others to rob the station because his fingerprints and photograph were on file with the police, that just prior to the actual robbery attempt defendant stated that they could "get a whole lot of money from him" and that defendant remained in a car during the robbery attempt awaiting the return of the robbers with the fruits of the crime, defendant's active participation in the planned criminal activity not being required to establish guilt of the conspiracy.

2. **Homicide § 2— conspiracy to rob — murder during attempt to rob — responsibility of co-conspirator**

    Where defendant entered into a conspiracy to commit an armed robbery, he is criminally responsible for a murder committed by another conspirator during the attempted armed robbery even though he did not actively participate in that attempt.

3. **Conspiracy § 5; Criminal Law § 79— testimony by co-conspirator — independent proof of conspiracy**

    The State was not required to establish the existence of a conspiracy by independent proof before the sworn testimony of one conspirator could be introduced against another conspirator.

4. **Criminal Law § 79— unsupported testimony of co-conspirator**

    The unsupported testimony of a co-conspirator is sufficient to sustain a verdict although the jury should receive and act upon such testimony with caution.

5. **Constitutional Law § 29; Criminal Law § 135; Jury § 7— selection of jury — inquiries as to death penalty views**

    It was error for the trial judge in a capital case to deny the solicitor and defense counsel the right to examine prospective jurors concerning their moral or religious scruples, beliefs, and attitudes toward capital punishment since both the State and the defendant were thus deprived of the right to exercise intelligently their peremptory challenges and their challenges for cause.

6. **Criminal Law § 88— co-conspirator as State's witness — cross-examination as to plea bargaining — exclusion of mention of possible death penalty**

    In a first degree murder case in which defendant was permitted to cross-examine a co-conspirator who testified for the State with respect to the fact that he had originally been charged with first

degree murder and had been allowed to plead guilty to second degree murder, the trial court erred in limiting the scope of such cross-examination so as to exclude all mention of the death penalty which might have been imposed upon the co-conspirator for a conviction of first degree murder.

DEFENDANT appeals from judgment of *Ervin, J.,* 29 October 1973 Session, MECKLENBURG Superior Court.

Defendant was tried upon bills of indictment, consolidated for trial, charging (1) armed robbery, (2) conspiracy to commit armed robbery, and (3) first degree murder. The armed robbery charge was dismissed at the close of the State's evidence. Defendant was convicted on the two remaining charges and we allowed his petition to bypass the Court of Appeals in the conspiracy case to the end that both convictions might be reviewed by the Supreme Court.

The jury was selected in obedience to an instruction by the trial judge that neither the solicitor nor defense counsel should mention the fact on voir dire examination of the jurors that this was a capital case requiring imposition of the death penalty upon a verdict of guilty of first degree murder.

The State's evidence tends to show that on 18 June 1973 Albert "Butch" Carey was driving his wife's Buick Electra 225 automobile in which his younger brother Anthony Carey (defendant in this case), James Calvin "Peanut" Mitchell and Antonio Dorsey were riding. The car was driven down Trade Street and through the intersection of Trade and Cedar Street where the passengers observed Raymond B. Williams in the process of closing his Exxon service station. Butch Carey said at that time: "That's the man right there that we're going to get the money from. We need someone who is not scared." In the discussion which followed, defendant Anthony Carey stated that he would not go into the service station because his picture and fingerprints were on record at the Charlotte Police Department. Butch Carey suggested that Harold Givens was not afraid and would be willing to commit the robbery with Peanut Mitchell. Harold Givens was picked up at his home and the proposed armed robbery was outlined to him. It was then decided that it would be better to postpone the robbery for one day, and the occupants of the car were returned to their various homes.

The next day, 19 June 1973, Butch Carey and defendant Anthony Carey assembled the same group. Butch Carey was

driving the car, and they first picked up Peanut Mitchell followed by Harold Givens and Antonio Dorsey. Butch Carey drove the car to a point approximately three blocks from the scene of the proposed robbery and parked. While riding along Anthony Carey said: "There's a whole lot of money in there, and we can get a whole lot of money from him." It was about 6:30 p.m. Peanut Mitchell and Harold Givens left the car while the others remained in it and waited for their return. Mitchell carried with him a 20-gauge sawed-off shotgun which had been furnished by Butch Carey. Mitchell and Givens went to the service station where Givens entered and bought a soft drink while Mitchell remained outside near the rest room. Givens gave a prearranged signal to Mitchell who then came to the front of the service station where he pointed the gun at Raymond B. Williams, the owner, who was preparing to close the station and leave with the day's receipts. Mitchell ordered Mr. Williams to give him the money. Mr. Williams said nothing, but James D. Sloop, who had been employed by Mr. Williams for thirty-seven years, and who was on the scene at the time, said, "I wouldn't give you anything." Peanut Mitchell then fired the shotgun at Mr. Sloop as a result of which Mr. Sloop's stomach was blown open, his intestines fell out and were supported by the interlaced fingers of Mr. Sloop's hands. Numerous internal organs were perforated and damaged and there was profuse bleeding. Mr. Sloop was taken to the hospital where extensive surgery was undertaken. He lived thirteen days, dying on 3 July 1973 from infection caused by perforation of the digestive organs.

After the gun was discharged both Givens and Mitchell fled without getting the money or anything else. They were picked up by the Carey automobile and all the occupants were returned to their various homes. The attempted robbery took place between 6:30 and 7:00 p.m. on 19 June 1973.

James Calvin "Peanut" Mitchell was fifteen years and seven months old and had completed the ninth grade in school at the time Mr. Sloop was murdered. He was allowed to plead guilty to second degree murder and testified as a witness for the State, his sentence being deferred until after the trial of his codefendants. On a voir dire hearing in the absence of the jury, the trial court instructed defense counsel that cross-examination of Mitchell with regard to the plea-bargaining would be permitted in the presence of the jury but that no mention was to be made of the death penalty which might have been imposed upon Mitchell for a first degree murder conviction.

Mitchell testified that he, Butch Carey, Anthony Carey, and Antonio Dorsey planned the service station robbery prior to the date it was attempted; that he was in the company of Anthony and Butch Carey on the 18th of June from late morning until approximately 6:00 p.m.; that he met with Butch and Anthony Carey between 4:00 and 5:00 p.m. on 19 June 1973 and rode around with them for about two hours, passing the Exxon station five or six times; that he originally was charged with first degree murder of Mr. Sloop, pled guilty to second degree murder and had not been sentenced. He said he told Officer H. R. Thompson about the Exxon station robbery and signed a written statement containing the same information he had already related, and after giving the statement he accompanied Officer Fesperman to the Exxon service station and showed the officer "the way that I had run from the station and the path which I took in leaving the station. I also showed Officer Fesperman where I reloaded the shotgun."

The State offered in evidence a written waiver of rights and waiver of counsel signed by Anthony Carey dated 11 July 1973 at 3:15 p.m. (State's Exhibit 8) together with Anthony Carey's written statement bearing the same date and indicating it was finished at 4:10 p.m. The pertinent portion of the statement concerning the murder of James Sloop reads as follows:

"Sometime just before the man got shot down at the Exxon Station, we all, Butch, me, and James Mitchell, and Tony Dorsey, and Harold Givens, were in Butch's car. We were all in the car together. I believe Harold ask me to go with him to rob the man and I told him I wasn't going. Harold or Peanut (James Mitchell), one of them, asked Tony if he would go and Tony told them he wasn't going. Tony said he wasn't going because Peanut accused Tony of being scared and Tony made some kind of remark back to Peanut. We went out West Trade Street to Cedar Street there at the station (Exxon Station), then we went to the next corner and went across 5th Street and we went up a little bit. We let Peanut and Harold out of the car. ~~Peanut had the gun.~~ (HRT) (AC) We let them out on Cedar Street. Peanut said when they finished the job that they were going to run back down Cedar Street—indicating the Fifth Street area. He said 'If you all don't find me, I will be in the Fairview Homes.' We then rode on down by the cemetery on Kates Street. We came back to Trade Street and

State v. Carey

went across Trade Street and went back by the service station. We saw Peanut standing by the bathroom on the side at the station and Harold was going toward the drink box to get a drink. We turned left on Cedar Street and went to 5th to the traffic light and we saw Peanut and Harold running behind the service station. Before this we had heard a shot. Then we turned left on Fifth Street and we lost Peanut and Harold and we went on to Sycamore Street. We came back and hit Irwin Avenue and we saw Peanut coming down behind the building that sits on the corner of Fifth and Irwin, and we stopped and picked up Peanut and Harold. We went right on Fifth and went toward Johnson C. Smith University and went to Grant Street. In the meantime, we had heard the shot and when they got into the car, we were all kind of scared. Nobody said anything about this until we got back home on Grant Street. I asked Peanut why he shot the man and he said something like 'He was trying to be like all the rest, they want to go for their gun.' Harold said that he didn't get the money because 'I saw all that blood and got scared and ran.' "

Defendant testified in his own behalf. He stated that he did not participate in the robbery of the Exxon station where Mr. Sloop was shot and did not help anybody plan that robbery. He said: "I never encouraged anyone to commit that robbery. I had no knowledge of the crimes which were being committed by Peanut Mitchell until later in the month of June when his activities became common knowledge in my community. I had no knowledge of the Exxon service station robbery prior to the time the robbery took place."

Other witnesses testifying for the defendant placed him elsewhere from late evening on 18 June 1973 until 7:00 p.m. on 19 June 1973. No alibi evidence was presented with respect to the period of time when the robbery was planned on 18 June 1973, but defendant denied any participation in the planning or commission of the attempted robbery and denied that he was with the alleged co-conspirators on either of the days in question.

Defendant was convicted of conspiracy to commit armed robbery and first degree murder. He received ten years on the conspiracy charge and was sentenced to death for first degree murder. Both cases are now before the Supreme Court for appellate review. Errors assigned are discussed in the opinion.

*Robert Morgan, Attorney General; James F. Bullock, Deputy Attorney General; and Raymond W. Dew, Jr., Assistant Attorney General, for the State of North Carolina.*

*Gene H. Kendall, attorney for defendant appellant.*

HUSKINS, Justice.

[1] The action of the trial court in overruling defendant's motion for judgment of nonsuit in the conspiracy case constitutes his first assignment of error.

"A criminal conspiracy is the unlawful concurrence of two or more persons in a wicked scheme—the combination or agreement to do an unlawful thing or to do a lawful thing in an unlawful way or by unlawful means. The conspiracy is the crime and not its execution." *State v. Goldberg,* 261 N.C. 181, 134 S.E. 2d 334 (1964), and cases cited therein; *accord,* 16 Am. Jur. 2d, Conspiracy § 1 (1964). "As soon as the union of wills for the unlawful purpose is perfected the offense of conspiracy is completed." *State v. Knotts,* 168 N.C. 173, 83 S.E. 972 (1914).

Viewed in the light most favorable to the State, the evidence shows that defendant, Peanut Mitchell, Harold Givens, Antonio Dorsey, and defendant's brother Butch Carey were together on 18 June 1973 when the robbery was planned. As they drove past the Exxon station on that date Butch Carey said: "That is the man right there we are going to get the money from. We need someone who is not scared." Peanut Mitchell suggested that defendant go with him to rob the station. Defendant rejected the suggestion because the Charlotte Police had his photograph and fingerprints on file. The same group reassembled on 19 June 1973 and, just prior to the actual robbery attempt, defendant said: "It's a whole lot of money in there, and we can get a whole lot of money from him." During the robbery attempt defendant remained in the car with Butch Carey and Antonio Dorsey, awaiting the return of the robbers with the fruits of the crime. He was a willing participant in the scheme.

Since the gravamen of the offense of conspiracy is the agreement or union of wills for the unlawful purpose, active participation in the planned criminal activity is not required to establish guilt. "A man may join a conspiracy by word or by deed. However, criminal responsibility for a conspiracy requires

more than a merely passive attitude toward an existing conspiracy. One who commits an overt act with knowledge of the conspiracy is guilty. And one who tacitly consents to the object of a conspiracy and goes along with the other conspirators, actually standing by while the others put the conspiracy into effect, is guilty though he intends to take no active part in the crime." 16 Am. Jur. 2d, Conspiracy § 15 (1964).

In *State v. Turner,* 119 N.C. 841, 25 S.E. 810 (1896), we said that "[t]hose who aid, abet, counsel *or encourage,* as well as those who execute their designs, are conspirators. . . . " (Emphasis added.) In *State v. Andrews,* 216 N.C. 574, 6 S.E. 2d 35 (1939), responding to a contention similar to that advanced by this defendant, we said: "The fact that the appealing defendant did not personally participate in the overt act is not material if it be established by competent evidence that he entered into an unlawful confederation for the criminal purpose alleged."

In light of these legal principles, we hold the evidence is sufficient to make out a *prima facie* case of conspiracy and to withstand the motion for judgment of nonsuit.

[2]  By like reasoning, defendant argues that since he did not actively participate in the armed robbery attempt he is not criminally responsible for the murder committed in that attempt. Denial of his motion to nonsuit the murder case is assigned as error.

"Those who enter into a conspiracy to violate the criminal laws thereby forfeit their independence, and jeopardize their liberty, for, by agreeing with another or others to engage in an unlawful enterprise, they thereby place their safety and freedom in the hands of each and every member of the conspiracy." *State v. Gibson,* 233 N.C. 691, 65 S.E. 2d 508 (1951).

"The felony-murder rule applies whenever a conspirator kills another person in the course of committing a felony, as against the contention that the killing was not part of the conspiracy. If the unlawful act agreed to be done is dangerous or homicidal in its character, or if its accomplishment will necessarily or probably require the use of force and violence, which may result in the taking of life unlawfully, *every party* to such agreement will be held criminally liable for whatever any of his co-conspirators may do in furtherance of the common design." 1 Wharton's Criminal Law and Procedure § 251 (1957) (emphasis added). *Accord,* 40 Am. Jur. 2d, Homicide §§ 34-35

(1968) ; 40 C.J.S., Homicide § 9e(1) (1944). For a more general statement of the same principle, see *State v. Kelly*, 243 N.C. 177, 90 S.E. 2d 241 (1955) ; *State v. Smith*, 221 N.C. 400, 20 S.E. 2d 360 (1942) ; *State v. Williams*, 216 N.C. 446, 5 S.E. 2d 314 (1939) ; 16 Am. Jur. 2d, Conspiracy § 14 (1964).

The following statement from *State v. Fox*, 277 N.C. 1, 175 S.E. 2d 561 (1970), is in agreement with the general rule and is most appropriate here: "[W]hen a conspiracy is formed to commit a robbery or burglary, and a murder is committed by any one of the conspirators in the attempted perpetration of the crime, each and all of the conspirators are guilty of murder in the first degree." *Accord, State v. Bell*, 205 N.C. 225, 171 S.E. 50 (1933).

Application of the foregoing principles to the evidence in this case leads inexorably to the conclusion that defendant's motion for judgment of nonsuit in the murder case was properly denied. The evidence makes a case for the jury. Defendant's first assignment of error is overruled.

[3] Defendant contends the trial court erred in allowing James Calvin Mitchell, alleged co-conspirator, to testify to defendant's involvement in the conspiracy. Defendant argues that the State is required to establish the existence of the conspiracy by independent proof before evidence of the conspiracy from a co-conspirator can be introduced.

The principles defendant urges us to apply in this case were stated in *State v. Conrad*, 275 N.C. 342, 168 S.E. 2d 39 (1969), as follows:

"The general rule is that when evidence of a prima facie case of conspiracy has been introduced, the acts and declarations of each party to it in furtherance of its objectives are admissible against the other members. *State v. Gibson*, 233 N.C. 691, 65 S.E. 2d 508; *State v. Smith*, 221 N.C. 400, 20 S.E. 2d 360; 16 Am. Jur. 2d, Conspiracy, §§ 35, 36, 37, 38, pp. 146, 147 (citing authorities). Consideration of the acts or declarations of one as evidence against the co-conspirators should be conditioned upon a finding: (1) a conspiracy existed; (2) the acts or declarations were made by a party to it and in pursuance of its objectives; and (3) while it was active, that is, after it was formed and before it ended. *State v. Dale*, 218 N.C. 625, 12 S.E. 2d 556; *State v. Lea*, 203 N.C. 13, 164 S.E. 737; 11 Am. Jur.

571. Of course a different rule applies to acts and declarations made before the conspiracy was formed or after it terminated. Prior or subsequent acts or declarations are admissible only against him who committed the acts or made the declarations."

Defendant seeks to apply a sound principle of law to an ineligible state of facts. Of course, the existence of a conspiracy must be established by evidence *aliunde* for the *acts and declarations* of one conspirator, in furtherance of the common design, to be competent against the others. *State v. Benson,* 234 N.C. 263, 66 S.E. 2d 893 (1951) ; *State v. Blanton,* 227 N.C. 517, 42 S.E. 2d 663 (1947) ; 2 Strong's N. C. Index 2d, Conspiracy § 5 (1967). This rule, however, affords this defendant no solace because this case does not involve the use of *acts and declarations* of one conspirator against another. Rather, it involves the *sworn testimony* of one conspirator against another.

[4] It is seldom that the State can show the existence of a conspiracy by direct proof, but when the testimony of a co-conspirator is available it is competent to establish the conspiracy. *State v. Summerlin,* 232 N.C. 333, 60 S.E. 2d 322 (1950). A co-conspirator is an accomplice and is always a competent witness. *State v. Goldberg,* 261 N.C. 181, 134 S.E. 2d 334 (1964) ; 16 Am. Jur. 2d, Conspiracy § 41 (1964). It has been held in many cases that the unsupported testimony of a co-conspirator is sufficient to sustain a verdict, although the jury should receive and act upon such testimony with caution. *State v. Horton,* 275 N.C. 651, 170 S.E. 2d 466 (1969), *cert. denied,* 398 U.S. 959 (1970). *See State v. Tilley,* 239 N.C. 245, 79 S.E. 2d 473 (1954) ; *State v. Bovender,* 233 N.C. 683, 65 S.E. 2d 323 (1951).

Under applicable principles of law James Calvin Mitchell was a competent witness to testify to the conspiracy. Defendant's second assignment of error is overruled.

Prior to arraignment the trial judge instructed the solicitor and defense counsel that the fact that this was a capital case or that the death penalty might be imposed should not be mentioned in the presence of the jury. Defendant objected to this instruction and now assigns it as error. He contends that denial of his right to question prospective jurors concerning their views on capital punishment or to inform them of the punishment prescribed by law upon a verdict of guilty of first degree murder was prejudicial and requires a new trial.

The basic concept in jury selection is that each party to a trial has the right to present his cause to an unbiased and impartial jury. *State v. Spence,* 274 N.C. 536, 164 S.E. 2d 593 (1968); *State v. Peele,* 274 N.C. 106, 161 S.E. 2d 568 (1968). "A defendant on trial has the right to reject any juror for cause or within the limits of his peremptory challenges before the panel is completed." *State v. McKethan,* 269 N.C. 81, 152 S.E. 2d 341 (1967).

"Peremptory challenges are challenges which may be made or omitted according to the judgment, will, or caprice of the party entitled thereto, without assigning any reason therefor, or without being required to assign a reason therefor." 50 C.J.S., Juries § 280(a) (1947). *Accord, State v. Allred,* 275 N.C. 554, 169 S.E. 2d 833 (1969); *Freeman v. Ponder,* 234 N.C. 294, 67 S.E. 2d 292 (1951); 47 Am. Jur. 2d, Jury § 233 (1969). G.S. 9-21(a) confers upon each defendant in a capital case the right to challenge fourteen jurors "peremptorily without cause."

In *State v. Allred, supra,* we quoted with approval the following passage from *State v. Brooks,* 57 Mont. 480, 188 P. 942 (1920) : "The *voir dire* examination of jurors is a right secured to the defendant by the statutes and has a definite double purpose: First, to ascertain whether there exist grounds for challenge for cause; and, second, to enable counsel to exercise intelligently the peremptory challenges allowed by law." The quoted passage vividly reveals the crucial relationship between voir dire examination of prospective jurors and challenges, both peremptory and for cause. The right to make inquiry as to the fitness and competency of any person to serve as a juror is vouchsafed by G.S. 9-15(a) which provides: "The court, and any party to an action, or his counsel of record, shall be allowed, in selecting the jury, to make direct oral inquiry of any prospective juror as to the fitness and competency of any person to serve as a juror, without having such inquiry treated as a challenge of such person, and it shall not be considered by the court that any person is challenged as a juror until the party shall formally state that such person is so challenged." The extent of the inquiries, of course, is subject to the control and supervision of the trial judge. *State v. Harris,* 283 N.C. 46, 194 S.E. 2d 796 (1973); *State v. Bryant,* 282 N.C. 92, 191 S.E. 2d 745 (1972).

Since decision of the United States Supreme Court in *Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct.

1770 (1968), we have held in many capital cases that solicitors may ask prospective jurors whether they have moral or religious scruples against capital punishment; if so, whether they are willing to consider all of the penalties provided by law, or are irrevocably committed to vote against a verdict carrying the death penalty regardless of the facts and circumstances that might be revealed by the evidence. See *State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817 (1974) ; *State v. Honeycutt,* 285 N.C. 174, 203 S.E. 2d 844 (1974) ; *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974) ; *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974) ; *State v. Washington,* 283 N.C. 175, 195 S.E. 2d 534 (1973) ; *State v. Frazier,* 280 N.C. 181, 185 S.E. 2d 652 (1972) ; *State v. Doss,* 279 N.C. 413, 183 S.E. 2d 671 (1971) ; *State v. Sanders,* 276 N.C. 598, 174 S.E. 2d 487 (1970).

This right of inquiry concerning a prospective juror's competency and fitness to serve may, of course, be exercised by or on behalf of the defendant as well as the State. "In order to insure a fair trial before an unbiased jury, it is entirely proper in a capital case for both the State and the defendant to make appropriate inquiry concerning a prospective juror's moral or religious scruples, beliefs, and attitudes toward capital punishment." *State v. Crowder, supra.*

[5] Applying the foregoing principles, we hold it was error for the trial judge to deny the solicitor and defense counsel the right to examine prospective jurors concerning their moral or religious scruples, beliefs, and attitudes toward capital punishment. Both the State and the defendant were thus deprived of the right to exercise intelligently their peremptory challenges and their challenges for cause. This assignment is sustained and requires a new trial.

[6] Defendant contends it was error for the trial judge to preclude mention of the death penalty during the cross-examination of Peanut Mitchell.

The record discloses that defendant was permitted to cross-examine Mitchell with respect to his plea bargaining and the fact that he was originally charged with first degree murder. Mitchell testified on cross-examination in regard to this matter as follows: "I have not been sentenced for murder in the Sloop robbery murder. I don't know when I will be sentenced. I was originally charged with murder and have entered a plea

of guilty of murder in the second degree, which is a different charge from that with which I was first charged."

"Cross-examination of an opposing witness for the purpose of showing his bias or interest is a substantial legal right, which the trial judge can neither abrogate nor abridge to the prejudice of the cross-examining party." *State v. Hart*, 239 N.C. 709, 80 S.E. 2d 901 (1954).

"While latitude is allowed in showing the bias, hostility, corruption, prejudice and interest or misconduct of the witness with respect to the case or other facts tending to prove that his testimony is unworthy of credit, 3 Jones on Evidence, 1538, the question as to the extent to which the cross-examination may extend is to be determined with a view to the discretion of the trial judge. Nevertheless, if the latter has excluded testimony which would clearly show bias, interest, the promise, or the hope of reward on the part of the witness, it is error and may be ground for a new trial. *Alford v. U.S.*, 75 L.Ed., 624; 3 Jones on Evidence, 1538. The discretionary power of the trial judge is to confine the cross-examination within reasonable limits. It does not include the authority to exclude altogether questions, and the answers thereto, which directly challenge the disinterestedness or credibility of the witness' testimony." *State v. Roberson*, 215 N.C. 784, 3 S.E. 2d 277 (1939).

The pressures which induced Peanut Mitchell to plead guilty to second degree murder and to testify for the State against a co-conspirator are material and have a substantial bearing upon the credibility to be given his testimony, and are permissible subjects for cross-examination. It is logical to assume that one very important factor which may have influenced Mitchell's decision to cooperate with the State was the possibility that had he been tried for first degree murder, he might have been convicted and sentenced to death. Because the question of Mitchell's credibility and bias is of such vast importance in this case, we hold it was error for the scope of cross-examination to be limited so as to exclude all mention of the death penalty.

We deem it unnecessary to discuss other assignments of error relating to recall of a witness and to instructions given by the court, in response to a juror's question, alleged by defendant to contradict instructions initially given. These are matters not likely to arise on retrial.

State v. Carey

For error committed with respect to selection of the jury defendant is entitled to a new trial and it is so ordered.

New trial.