STATE OF NORTH CAROLINA v. MARGIE C. BOYKIN

No. 29

(Filed 7 December 1976)

1. Constitutional Law § 30; Criminal Law § 15— fair trial — change of venue — word-of-mouth publicity

Prejudice resulting to a defendant from pretrial word-of-mouth publicity as well as from media publicity may violate the constitutional requirement of a fair trial or require a change of venue or a special venire under N. C. statutes.

2. Constitutional Law § 30; Criminal Law § 15— change of venue or special venire

If, under the evidence presented upon a motion for a change of venue or a special venire because of word-of-mouth publicity, there is a reasonable likelihood that a fair trial cannot be had because of such publicity, it is an abuse of discretion for the court to fail to grant a change of venue or a special venire.

3. **Criminal Law § 15— word-of-mouth publicity — denial of change of venue or special venire**

   The trial judge in a first degree murder case did not abuse his discretion in the denial of defendant's motion for a change of venue or, in the alternative, for a special venire because of pretrial word-of-mouth publicity where defendant presented seventy-three printed form statements signed by residents of the county of trial in which the residents indicated they had heard one or more of seven rumors listed in the statement concerning defendant's participation in the crime charged or in various other criminal activities, but there was no evidence to show how the persons contacted by defendant were chosen, the total number of persons contacted, or that defendant did not aggravate the publicity problem by her poll of county residents, and none of the statements indicated that the persons signing them had any preconceived opinion as to defendant's guilt of the crime charged; furthermore, defendant was not prejudiced by the denial of her motion since all the jurors stated on *voir dire* that they could give defendant a fair trial, defendant failed to exhaust her peremptory challenges, and the convincing quality of the State's evidence would have produced the same result if the jury had been chosen from another county.

4. **Jury § 6— questioning of jurors — rumors about defendant**

   The trial judge in a first degree murder case did not err in refusing to permit defense counsel to ask prospective jurors whether they had heard certain rumors about defendant where defendant did not request that the prospective jurors be separately sworn and separately examined since an unfavorable answer by a juror might have prejudiced the remaining jurors in the jury box.

5. **Constitutional Law § 36; Homicide § 31— substitution of life imprisonment for death penalty**

   Sentence of life imprisonment is substituted for the death penalty imposed upon defendant's conviction of first degree murder.

   Chief Justice SHARP dissenting.

   Justice EXUM joins in the dissent.

DEFENDANT appeals pursuant to G.S. 7A-27(a) from judgment of *Brewer, J.,* entered at the 1 December 1975 Session of JOHNSTON County Superior Court. Defendant's conviction of conspiracy to commit murder was certified for initial appellate review by the Supreme Court pursuant to G.S. 7A-31(a) on 16 May 1976.

On indictments, proper in form, defendant was charged and convicted of first degree murder and conspiracy to commit murder. The death sentence was imposed for the murder conviction and a term of ten years imprisonment for the conspiracy conviction to commence at the expiration of the first degree murder sentence.

The evidence for the State tended to show the following: Defendant was married to the deceased, Daniel S. Boykin, known as "Chick" Boykin. Shortly after midnight on 15 August 1975, Daniel Davis, a neighbor, arrived at the Boykin home in response to a hysterical telephone call from the defendant, saying that she and her husband had been robbed and that "Chick" had been killed. Davis examined "Chick" Boykin's body which was lying in a pool of blood in the bathroom and found it to be almost cold. While in the living room with the defendant, Davis heard her say "Is that god-dam son-of-a-bitch dead, I hope that god-dam son-of-a-bitch is dead."

The defendant reported to officers who later arrived on the scene that she and her husband had been robbed and that in the course of it she was knocked in the head. Defendant's face was red around her left eye.

Garland Sanders testified that he was employed by the defendant to murder her husband. Under a plea bargain arrangement with the State, he received a life sentence in return for a guilty plea to second degree murder. Sanders was first introduced to the defendant by her maid, Minnie Dublin, a year and a half before the murder. He revealed that he had a number of conversations with defendant at Minnie Dublin's house during which she solicited him to kill "Chick" Boykin. At first Sanders indicated that he was not interested and she inquired if he knew anyone else who would do it. Later she brought him a .22 caliber pistol and said "Here is the gun. I have got the gun for you I want you to kill him with." Sanders continued to decline and returned the pistol to Minnie to give to the defendant. Finally, he agreed to do "the job" on Thursday, 14 August 1975, for $2,000.

Defendant provided Sanders a rifle and some bullets. She instructed Sanders to ring the front door bell and then go around to the back of the house. She told him that gloves, masking tape, and a shotgun would be at the back door, a key to her 1974 225 Electra Buick would be in the ignition switch, the back door would be unlocked and the floodlight would be out. The defendant told Sanders to get someone to drive him to the Boykin home so he arranged to have Johnny Edmondson drop him off about 11 p.m.

Before going to the house that night, Sanders called the defendant from a service station phone. She said "Everything

is right, to come on in about 30 minutes." A half hour later Edmondson left Sanders at the Boykin house. Armed with the rifle, Sanders went to the back door and put on the gloves which he found on the doorsteps. He then rang the front doorbell. Returning to the back where the floodlight was out as defendant had promised, he picked up the masking tape and the 12 gauge single barrel shotgun which defendant had said would be on the steps. Defendant came to the back window, raised it and said "Come on in, Mr. Boykin is up front watching television."

When Sanders opened the storm door, "Chick" opened the wooden door. Defendant said "shoot," and, after the first shot, "shoot again." "Chick" was first hit under the left arm. He fell to the floor and Sanders shot him two more times in the head. Defendant then instructed Sanders to tie her up with the tape but Sanders refused, got in her car and drove off carrying the rifle and the shotgun. Later Sanders met Johnny Edmondson and abandoned defendant's car. Edmondson pawned the rifle and shotgun.

About two weeks after the murder, defendant gave Sanders an envelope containing $1,100 in cash. He used $343 of the money to get his car out of the garage and deposited $700 of it in the Micro bank. Defendant made no further payments but promised to pay Sanders the balance out of the insurance proceeds.

Substantial direct and circumstantial evidence from numerous sources corroborated Sanders in every minute detail.

Expert testimony disclosed that the three bullets removed from "Chick" Boykin's body were fired from a rifle which was identified as belonging to "Chick" Boykin and which Sanders said he used in the murder.

A bank cashier testified that the defendant withdrew $1,200 in cash including ten $100 bills on 28 August 1975.

The defendant's evidence tended to show that she had nothing to do with the murder of her husband. She contended that a large amount of cash and "Chick's" shotgun and rifle were stolen the night of the murder. She said that $900 of the money, which she withdrew from the bank on 28 August 1975 after the murder, was loaned to her son, but he was unable to account for it.

Other facts relevant to the decision will be discussed in the opinion.

*Attorney General Rufus L. Edmisten by James E. Magner, Jr., Assistant Attorney General for the State.*

*Knox V. Jenkins, Jr., and Thomas S. Berkau for defendant appellant.*

COPELAND, Justice.

Defendant contends that the trial court erred in denying her motion for a change of venue as provided in G.S. 15A-957 or in the alternative, for a special venire panel under G.S. 15A-958. At the pretrial motion hearing, defense counsel argued that prejudice against the defendant in Johnston County would not allow her to obtain a fair and impartial trial. In support of his motion, counsel filed five affidavits and seventy-three unsworn statements of county residents. The form statements, printed in advance, contained a number of rumors concerning the defendant which had allegedly circulated throughout Johnston County. The person being asked to sign a statement was apparently requested to choose from the following rumors about the defendant those he had heard: "(1) That she hired some blacks to kill her husband; (2) That she killed her first husband; (3) That she killed her husband's brother-in-law and fed him to some hogs; (4) That she killed an individual formerly married to her daughter; (5) That she had performed abortions and a girl died; (6) That she was instrumental in the death of her son's former fiancee who was killed in an automobile accident; (7) That she was involved in the theft of television sets from Sylvania." Defendant had never been charged with or convicted of any of these crimes, other than those involved in the present case. The trial judge agreed to consider the unsworn statements in support of defendant's motion.

Defendant also offered as Exhibit No. 80 a "color-coded" map of townships in Johnston County. We were not provided a key to the map and thus cannot determine its significance. At the motion hearing the trial judge indicated that he would exclude jurors from "two particular townships in that area," provided the defendant and the district attorney agreed. Whether or not this precaution was followed does not appear of record. Presumably, Exhibit No. 80 had something to do with this.

A motion for change of venue or for a special venire panel "is addressed to the sound discretion of the trial judge, and abuse of discretion must be shown before there is any error." *State v. Harrill,* 289 N.C. 186, 190, 221 S.E. 2d 325, 328 (1976); accord *State v. Thompson,* 287 N.C. 303, 214 S.E. 2d 742 (1975); *State v. Blackmon,* 280 N.C. 42, 185 S.E. 2d 123 (1971).

At the pretrial hearing no mention was made of any adverse publicity in newspapers, magazines, radio or television. In fact, defendant candidly admits that newspaper accounts in this case have not been inflammatory. All of our previous criminal cases were directed toward this type of unfavorable publicity. We find no criminal cases in North Carolina or elsewhere dealing with word-of-mouth publicity.

[1] "Due process requires that the accused receive a trial by an impartial jury free from outside influences." *Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed. 2d 600, 620 (1966). While every criminal case that we have been able to find in which change of venue was in issue has dealt with prejudice resulting from pretrial *media* publicity, we believe the constitutional requirement of a fair trial is not so limited. Nor are our statutes which require a change of venue or a special venire panel where prejudice is so great as to prevent a fair trial, restricted to media inspired prejudice. As the late Mr. Justice Holmes once wrote:

> "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and arguments in open court, and not by outside influence, whether of *private talk* or public print." (Emphasis added.) *Patterson v. State of Colorado ex rel. Attorney General,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879, 881 (1907); accord, *Sheppard v. Maxwell, supra* at 351, 86 S.Ct. at 1516, 16 L.Ed. 2d at 614.

[2] The burden of showing "so great a prejudice against the defendant that he cannot obtain a fair and impartial trial" falls on the defendant. G.S. 15A-957. In *Sheppard v. Maxwell, supra,* involving pretrial press publicity, the United States Supreme Court held, where there is a "reasonable likelihood" that prejudicial news prior to trial will prevent a fair trial, the trial judge should transfer the case to another county not so permeated with publicity. The same standard of proof should apply where

the prejudice alleged is attributable to word-of-mouth publicity. If, under the evidence presented, there is a reasonable likelihood that a fair trial cannot be had, it is an abuse of discretion to fail to grant a change of venue or a special venire panel.

In considering the type of prejudice here alleged for the first time this court is sensitive to the difficulty of proving prejudice generated by "private talk." At the same time, this court must be solicitous of the potential for manufacture and manipulation of proof of this type of prejudice. By this statement we do not imply that the able trial counsel engaged in this type of conduct. In the case of adverse media publicity, a trial judge in arriving at his determination can easily examine the allegedly inflammatory articles and take evidence on the number of copies circulated in the county and the number of county residents. These figures are objective.

[3] With printed statements of rumors as were used in this case, defense counsel should, at a minimum, introduce evidence of the number of persons approached, if any, who had *not* heard the rumors concerning this defendant. Here no evidence was offered of the total number of persons contacted before seventy-three individuals returned statements saying that they had heard at least one prejudicial rumor about the defendant. Nor was any evidence presented as to how the individuals solicited were chosen. Were they selected at random from voter registration lists or off the streets from all sections of the county?

In essence, defendant attempted with her unsworn statements to introduce a public opinion poll without giving the trial judge the vital statistics necessary for him to judge the likelihood of pretrial prejudice throughout the county. It should also be remembered that the critical questions are whether the person interviewed thought the defendant was guilty of the crimes charged and whether the person questioned believed the defendant could receive a fair trial in the county. None of the affiants or statement makers indicated that they had any preconceived opinion as to defendant's guilt. With the exception of defense attorney's own affidavit, none of the statements or affidavits expressed any opinion on the possibility of defendant's receiving an impartial trial in Johnston County.

A disturbing aspect of this case involves the type of prepared statements used by defense counsel. The forms printed in advance with seven rumors about the defendant obviously

helped to resurrect and disseminate stories about the defendant. Certainly, when anyone who had never heard the rumors was shown one of the forms, he could no longer truthfully say he had not heard them and probably he and others who viewed the form went on to spread the rumors to even greater audiences.

We note that all jurors questioned on voir dire stated that they could give the defendant a fair trial and that defendant did not exhaust her peremptory challenges.

Although the trial judge would have been fully justified in allowing either of defendant's motions, we cannot say he abused his discretion in denying the motions under the circumstances. While recognizing that there may be cases where widespread, word-of-mouth publicity may be as damaging to a defendant's right to an impartial trial as mass media publicity, we will be reluctant to conclude that there was a "reasonable likelihood" that a fair trial could not be had until defendant has demonstrated that steps were taken to insure the reliability of the opinion poll and that defendant did not aggravate the publicity problem. No abuse of discretion having been shown, the assignment of error is overruled.

[4] At the pretrial hearing, the trial judge indicated that defense counsel would have the opportunity to ask each juror whether or not he could give the defendant a fair and impartial trial and that if the juror could not do so, then he would be subject to challenge for cause. In the course of the hearing, counsel for defendant, inquired of the court "Can I ask them what they have heard about it, about her?" The court replied: "No, Sir. That would not be a competent question to pose to the jurors or prospective jurors." Defendant contends that the court committed error in this ruling.

The record does not disclose the manner in which the jury was chosen. In recent years it has become the practice in North Carolina to choose jurors in capital cases as well as others by placing twelve jurors in the jury box in the manner approved by our Court in *State v. Perry*, 277 N.C. 174, 176 S.E. 2d 729 (1970). Prior to that case, it has been the custom in capital cases in North Carolina to require each prospective juror to be separately sworn and separately examined, touching his or her fitness to serve on the trial panel. *State v. Roseboro*, 276 N.C. 185, 171 S.E. 2d 886 (1970).

Nothing else appearing, we assume that the jury in this case was selected in the manner approved by *State v. Perry, supra.* That being so, we cannot conceive of the able trial counsel asking a prospective juror whether he or she had heard any of the rumors set forth in the affidavits or unsworn statements. Had counsel done so and the answers been unfavorable, the rest of the jurors in the jury box might have been prejudiced and defense counsel would have then been importuning the court for a continuance.

"Each defendant is entitled to full opportunity to face the prospective jurors, make diligent inquiry into their fitness to serve, and to exercise his right to challenge those who are objectionable to him." *State v. Perry, supra* at 177, 176 S.E. 2d at 731. However, "[I]n this jurisdiction counsel's exercise of the right to inquire into the fitness of jurors is subject to the trial judge's close supervision. The regulation of the manner and the extent of the inquiry rests largely in the trial judge's discretion. [Citation omitted.] The overwhelming majority of the states follow this rule." *State v. Bryant,* 282 N.C. 92, 96, 191 S.E. 2d 745, 748 (1972), cert. denied, 410 U.S. 987, 36 L.Ed. 2d 184, 93 S.Ct. 1516 (1973) ; accord, *State v. Carey,* 285 N.C. 497, 206 S.E. 2d 213 (1974).

If defendant wished to pursue a line of questioning concerning the rumors to ascertain whether there existed grounds for challenge for cause or to enable her to exercise intelligently the peremptory challenges allowed by law, she should have requested that the prospective jurors be separately sworn and separately examined. No such request appearing in the record, we must assume that it was not made.

We reiterate that jurors accepted by the defendant all stated that they could give the defendant a fair and impartial trial and that defendant did not exhaust her peremptory challenges. Although a few of the jurors on the panel indicated that they had heard this case discussed prior to trial, of those, none had apparently heard the defendant's reputation discussed. Pretrial discussion of a case does not necessarily render a prospective juror impartial, especially where the discussion is limited to information appearing in noninflammatory newspaper articles. In *Irvin. v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed. 2d 751, 756 (1961), the United States Supreme Court said:

"It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."

In the absence of a request to have the jurors examined separately, we cannot hypothesize what the jurors heard concerning this case prior to trial. This· Court finds itself in a position analogous to that presented when a trial judge sustains an objection to a question and examining counsel fails to have recorded what the answer would have been.

The evidence in this case was overwhelming, and thus we cannot conceive of any prejudice resulting to this defendant. We conclude that the convincing quality of the State's evidence would have certainly produced the same result if the jury could have been chosen from Cherokee County, the· most distant point from Johnston County. If error there be in either of these assignments, it was harmless beyond a reasonable doubt. *Chapman v. Calif.*, 386 U.S. 18, 17 L.Ed.· 2d 705, 87 S.Ct. 824 (1967).

[5]   The attorney general's office in its brief calls to our attention the imposition of the death penalty. In *Woodson v. North Carolina*, ____ U.S. ____ , 49 L.Ed. 2d 944, 96 S.Ct. 2978 (1976), the United States Supreme Court invalidated the death penalty provisions of G.S. 14-17 (Cum. Supp. 1975) under which defendant was sentenced. Ex mero motu and by authority of the provisions of 1973 Sess. Laws, c. 1201 § 7 (1974 Session), a sentence of life imprisonment is substituted for the death penalty in this case.

This case is remanded to the Superior Court of Johnston County with directions (1) that the presiding judge, without requiring the presence of the defendant, enter a judgment imposing life imprisonment for the murder of which defendant has been convicted and (2) in accordance with this judgment, the Clerk of Superior Court issue a commitment in substitution for the commitment heretofore issued. It is further ordered that the clerk furnish to the defendant and her attorney a copy of the judgment and commitment as revised in accordance with this opinion.

State v. Boykin

Because of the serious nature of this case, we have searched the record for errors other than those assigned and have found none prejudicial to the defendant other than the failure of defense counsel to assign error under *Woodson v. North Carolina, supra.*

In the trial we find

No error.

Death sentence vacated and, in lieu thereof, life sentence imposed.

Chief Justice SHARP dissenting.

Despite defendant's inadequate and unscientific methods of garnering evidence in support of her motion for a change of venue, the record convinces me that the motion should have been allowed and that the court's failure to grant it entitles her to a new trial. When rumors have begun to circulate, so damaging to the defendant that her counsel dares not ask a prospective juror if he has heard them, it seems to me that neither counsel's failure to exhaust his peremptory challenges nor to request that prospective jurors be separately examined on *voir dire* can constitute a waiver of defendant's right to a change of venue. The separate examination of jurors, which the majority suggests as the solution in such a situation, could be a safeguard only if every juror examined and excused were held incommunicado until the trial jury had been impaneled and committed to the bailiff's custody. In a case like this such a procedure would seem to be obviously impractical.

Nor should we say that, because the evidence of defendant's guilt is so overwhelming that any jury anywhere would have returned a verdict of "guilty as charged," an error of law which otherwise would have been grounds for a new trial is harmless. Such an approach nullifies both the presumption of innocence and the requirements of due process, and it harbors the implication that the trial itself was unnecessary. I therefore respectfully dissent and vote for a new trial.

Justice EXUM joins in this dissent.