STATE OF NORTH CAROLINA v. JEANETTE MARTHA GRIER

No. 7619SC6

(Filed 4 August 1976)

1. Assault and Battery § 14; Conspiracy § 6; Property § 4— conspiracy — malicious injury by explosives — sufficiency of evidence

The State's evidence was sufficient for submission to the jury on issues of defendant's guilt of (1) conspiracy maliciously to injure a named person, an S.B.I. agent, by use of an explosive device, (2) malicious injury of the S.B.I. agent by use of an explosive device, and (3) malicious damage to personal property, to-wit an S.B.I. automobile, being at the time occupied by the S.B.I. agent, by use of an explosive device, where it tended to show: defendant and three companions met in defendant's home; when a State's witness arrived, one of the companions asked the witness if he knew the S.B.I. agent and slammed the witness against the wall when he denied knowing the agent; defendant asked the witness about the license plate number of the car he was in earlier, apparently referring to the car used by the S.B.I. agent; while the witness was held at gunpoint, defendant stated that the witness "didn't have to tell them anything, they already knew who [the S.B.I. agent] was"; dynamite, wire and blasting caps were brought into defendant's home and were there openly displayed and discussed by two of defendant's companions; on several occasions

during this period, defendant went with two of her companions to another room of the house; one of the companions left defendant's house with the dynamite; defendant then left her residence and left her automobile behind to be used by her companions; two of the companions and the witness, who was still held at gunpoint, drove in defendant's car to another city where they met the third companion with the dynamite; those four drove in defendant's car to the S.B.I. agent's car, where two of the companions wired the dynamite to the agent's car; and the dynamite exploded when the agent attempted to start the car the following day.

**2. Conspiracy § 3— implied understanding — sufficiency for conviction**

For one to be convicted of the crime of conspiracy, the State need not prove that the parties agreed in express terms to unite for the common illegal purpose since a mutual, implied understanding is sufficient to constitute the offense.

**3. Conspiracy § 3— participation in planned crime not required**

Active participation in the planned criminal activity is not required to establish guilt of conspiracy.

**4. Conspiracy § 5— guilt of crimes contemplated by conspiracy — defendant not present at crime scene**

Defendant, as a party to a conspiracy, is equally guilty as a principal with the other participants in the commission of the crimes contemplated by the conspiracy even though defendant was not personally present when those crimes were committed.

ON *writ of certiorari* to review trial before *Rousseau, Judge.* Judgments entered 14 March 1975 in Superior Court, RANDOLPH County. Heard in the Court of Appeals 14 April 1976.

On the morning of 10 September 1974 Albert Stout, Jr., a Special Agent employed by the State Bureau of Investigation, left his apartment in Salisbury and got into the automobile provided for his use by the S.B.I. When he turned the key in the ignition an explosion occurred which demolished the car and severed his right leg. He was otherwise severely injured, but survived. Investigation by S.B.I. agents revealed that the explosion was caused by dynamite placed on the transmission of the automobile and wired to the starter.

In December 1974 the grand jury in Rowan County returned as true bills three indictments charging defendant as follows: (1) that she feloniously conspired with Jack Sellers, Jule Hutton, Otis James Blackmon, and Wilbut James Sanders willfully and maliciously to injure Albert Stout, Jr., by the use of an explosive device, a violation of G.S. 14-50(a); (2)

that she willfully and maliciously injured Stout by the use of an explosive device, a violation of G.S. 14-49(a); and (3) that she willfully and maliciously damaged personal property, to wit the S.B.I. automobile, being at the time occupied by Stout, by the use of an explosive device, a violation of G.S. 14-49.1. On motion of defendant, the cases were transferred for trial from Rowan to Randolph County. They were consolidated for trial, and defendant pled not guilty to all charges.

The State presented evidence to show the cause and effects of the explosion. Officer Stout testified that he was an undercover agent for the S.B.I. and in that capacity had purchased heroin from defendant, Jeanette Grier, and had testified against her in court at Charlotte. He had also purchased heroin from and testified against Otis James Blackmon. On 9 September 1974 he went to Charlotte to make an undercover narcotic purchase, driving the S.B.I. car, a brown Ford Torino. He went to the apartment of Jule Hutton, but did not see Hutton there. He returned to his apartment in Salisbury about midnight and locked and left the car on the apartment parking lot. When he attempted to start it on the following morning, the explosion occurred.

Jule Hutton, presented as a witness for the State, testified in substance to the following:

In September 1974 and for several months prior thereto he lived in Charlotte, working as a construction worker and also working with the Charlotte Police Department as an informer in connection with the drug traffic. In late August he met Officer Stout, whose last name he did not then know and who was introduced to him simply as "Al." He also knew the defendant, Jeanette Grier, and had been to her house to purchase drugs. On one occasion in late August he went there in the brown Ford Torino belonging to the S.B.I., but on that occasion the car was driven by another S.B.I. agent, not by Stout. On the afternoon of 9 September he again went to defendant's house. On arrival, he found Jack Sellers, Wilbut James Sanders, and Otis Blackmon, all of whom he had previously met, already there. Sellers was sitting on the couch in the living room, playing with a .38 caliber pistol. Otis Blackmon was standing in the doorway. Blackmon asked Hutton if he knew Albert Stout, and Hutton replied that he did not. Thereupon, Blackmon walked over, grabbed Hutton, and slammed him against the

wall. By this time the defendant, Jeanette Grier, came into the living room. She asked Hutton if he "thought any more about the license plate number of the car [he] was in earlier?" (Hutton was earlier in the brown Torino.) Hutton replied that he hadn't. Blackmon then pushed Hutton down on the couch. Sellers handed the gun to Sanders, telling Sanders to watch Hutton. Defendant Grier stated that Hutton "didn't have to tell them anything, they already knew who Albert Stout was." Grier, Blackmon, and Sellers then left the living room and went into another part of the house. When they returned several minutes later, Blackmon stated he "didn't know what was keeping that damn guy." Blackmon then left the house by the front door. A few minutes later he returned through the back door, followed by a man Hutton did not know. This man carried a brown paper bag with a Winn Dixie sign stamped on it. He went into a bedroom. A few minutes later, Blackmon, Sanders, and defendant Grier came out, and Blackmon let the man out of the back door. The brown paper bag was on the dining room table. Hutton watched as Sellers put on gloves and unwrapped the bag. Sellers took out from the brown bag a smaller cellophane bag, which he cut open with a penknife. From the cellophane bag Sellers took five sticks of dynamite, wired with clips on the end and silver objects which looked like blasting caps. Hutton testified that at this point:

"Mr. Blackmon hollered from the kitchen and asked Mr. Sellers was it all there. Mr. Sellers said, 'I don't know. I will let you know in a minute.' He proceeded to move the dynamite around, and he then stated to Mr. Blackmon it was all there. Mr. Blackmon said, 'Okay, cool.'"

Sellers then replaced the dynamite and other objects back into the cellophane bag and put this back inside the brown paper bag. After this was done, Blackmon, defendant Grier, and Sellers went into the bedroom. In about ten minutes, Blackmon and Sellers came out. Blackmon, telling Sellers he would get in touch with him later, picked up the brown paper bag and left by the front door. A few minutes later defendant Grier came out and, without saying anything to anyone, also left by the front door. Sellers then came over to Hutton and announced they were going to take a ride.

Sellers, first obtaining the revolver from Sanders, then left the house with Hutton by the rear door and got into a Buick

automobile which belonged to defendant Grier. They drove in this to Hutton's apartment, where they waited inside. After about twenty-five minutes, they heard a knock on the door. On peeping out, they saw Officer Stout standing on the front porch. At this time Sellers was holding the cocked pistol and was motioning to Hutton to be quiet. After knocking and getting no response, Stout left the porch and got into a car which resembled the brown Ford Torino. After Stout left, Sellers and Hutton waited five or six minutes and then drove back in defendant Grier's Buick to defendant's residence. There Sellers told Sanders that he had seen the undercover agent.

Later that night, Sellers, Sanders, and Hutton drove in defendant Grier's Buick to Salisbury. There they met Blackmon who was carrying the brown paper bag with the Winn Dixie sign on it. Blackmon got into the Buick with them, and Sellers drove to the apartment parking lot, where he pulled in behind the brown Torino. Sellers asked Hutton if that was "the undercover agent's Torino." Hutton replied that it was. Sellers and Blackmon then got out of the Buick, and went to Agent Stout's car, Blackmon carrying the brown paper bag with him. Sanders and Hutton remained in the Buick, Sanders holding the gun. Hutton watched as Sellers and Blackmon raised the hood on Stout's car, remain there several minutes, then lower the hood and return to the Buick. Blackmon stated "it would happen in the morning." They then drove from the parking lot to where Blackmon's car was parked. Before leaving the Buick, Blackmon told Sellers to kill Hutton and "leave him out beside the highway." Instead, Sellers drove Hutton in defendant's Buick back to defendant's home in Charlotte. There, after threatening Hutton, Sellers allowed Hutton to leave. The next day Hutton learned of the bombing and on the following day made a statement to the police.

Defendant Grier presented evidence, but did not herself testify. The jury found her guilty as charged in each of the three cases. The cases in which she was charged with conspiracy, a violation of G.S. 14-50(a), and in which she was charged with maliciously injuring Stout by the use of an explosive, a violation of G.S. 14-49(a), were consolidated for purposes of judgment. On the verdicts of guilty in these two cases defendant was sentenced to prison for a term of fifteen years. In the case in which defendant was charged with violation of G.S.

14-49.1 she was sentenced to prison for not less than fifty nor more than seventy years.

In apt time defendant gave notice of appeal. To permit perfection of the appeal, we granted defendant's petition for writ of certiorari.

*Attorney General Edmisten by Associate Attorney T. Lawrence Pollard for the State.*

*Charles V. Bell for defendant appellant.*

PARKER, Judge.

[1] Defendant brings forward but one assignment of error, that the court erred in denying her motions for nonsuit. We find no error.

When viewed in the light most favorable to the State, the evidence would permit the jury to find the following: On 9 September 1974, Blackmon, Sellers, and Sanders met with defendant Grier in defendant's home in Charlotte. Sellers was armed and openly displayed his pistol. When Hutton arrived, Blackmon asked Hutton if he knew Agent Stout. Hutton denied knowing Stout. In defendant's presence, Blackmon grabbed Hutton and slammed him against the wall. Defendant asked Hutton about the license plate number of the car he was in earlier, apparently referring to the brown Ford Torino used by Stout. Still in defendant's presence, Blackmon pushed Hutton down on the couch, while Sellers passed his gun to Sanders and told Sanders to watch Hutton. Defendant then stated that Hutton "didn't have to tell them anything, they already knew who Albert Stout was." Later, dynamite, wire, and blasting caps were brought into defendant's home and were there openly displayed and discussed by Sellers and Blackmon. On several occasions during this period, defendant went with Sellers and Blackmon to another room in the house. During all of these events, Hutton was being guarded by the threatening display of a pistol held either by Sellers or by Sanders. Blackmon left defendant's residence, carrying the dynamite with him. Shortly thereafter defendant also left her residence, leaving her Buick automobile behind to be used by Sellers.

On these findings it is a legitimate inference which the jury might draw that the plan to dynamite Stout's car was conceived and a number of important steps toward carrying out

the plan, including the assembling of the dynamite and accessory materials, were carried out in defendant's residence while she was present. Defendant must have been fully aware of what was taking place in her residence, yet she expressed no objection when dynamite was brought into her house, nor did she object at anytime during the extended period while Hutton was being held under armed guard in her house. Indeed, she even participated in questioning Hutton when she asked him concerning the license plate on Stout's car. That question, and her later statement that they already knew Stout's identity, demonstrates that she was fully aware of the subject under consideration. While these events were occurring in her home, on several occasions she went with Sellers and Blackmon to other rooms in her house, outside of Hutton's sight and hearing. A reasonable inference may be drawn that on these occasions the three discussed what was then taking place in the house. Finally, it is a reasonable inference which the jury might draw that defendant intentionally left her automobile to be used by Sellers in carrying out missions vital to the successful completion of the criminal enterprise in which he, Blackmon, and Sanders were then engaged. A reasonable inference clearly arises from all of the evidence that defendant not only knew and acquiesced in what was being planned in her home, but that she actively participated in the planning and joined in the criminal enterprise there undertaken.

[2, 3]  A conspiracy is an "agreement between two or more individuals to do an unlawful act or to do a lawful act in an unlawful way." *State v. Parker,* 234 N.C. 236, 241, 66 S.E. 2d 907, 912 (1951). The offense is complete whenever the union of wills for the unlawful purpose is established; the conspiracy itself being the crime and not the execution of the deed. *State v. Anderson,* 208 N.C. 771, 182 S.E. 643 (1935). For one to be convicted of the crime of conspiracy, the State need not prove that the parties agreed in express terms to unite for the common illegal purpose. A mutual, implied understanding is sufficient to constitute the offense. *State v. Smith,* 237 N.C. 1, 74 S.E. 2d 291 (1953). "Since the gravamen of the offense of conspiracy is the agreement or union of wills for the unlawful purpose, active participation in the planned criminal activity is not required to establish guilt. 'A man may join a conspiracy by word or by deed. However, criminal responsibility for a conspiracy requires more than a merely passive attitude toward

an existing conspiracy. One who commits an overt act with knowledge of the conspiracy is guilty. And one who tacitly consents to the object of a conspiracy and goes along with the other conspirators, actually standing by while the others put the conspiracy into effect, is guilty though he intends to take no active part in the crime.' " *State v. Carey,* 285 N.C. 497, 502, 206 S.E. 2d 213, 218 (1974). "Direct proof of the charge is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *State v. Whiteside,* 204 N.C. 710, 712, 169 S.E. 711, 712 (1933). Applying these principles, we find the evidence in this case clearly sufficient to withstand the motions for nonsuit on the charge of conspiracy.

[4]   We also find the evidence sufficient to survive the motions for nonsuit in the other two cases, in which defendant was charged as a principal with violations of G.S. 14-49(a) and G.S. 14-49.1. Defendant, as a party to the conspiracy, was equally guilty as a principal with the other participants in the commission of the crimes contemplated by the conspiracy. It makes no difference that defendant was not personally present when those crimes were committed, for "once a conspiracy is shown, each conspirator 'is responsible for all acts committed by the others in the execution of the common purpose which are a natural or probable consequence of the unlawful combination or undertaking, even though such acts are not intended or contemplated as a part of the original design.' " *State v. Bindyke,* 288 N.C. 608, 618, 220 S.E. 2d 521, 528 (1975), quoting from *State v. Smith,* 221 N.C. 400, 405, 20 S.E. 2d 360, 364 (1942). This principle, which has been stated with approval many times in decisions of our Supreme Court, was recently applied to sustain a conviction of first degree murder in a case in which the killing was committed in defendant's absence by defendant's co-conspirator while attempting to perpetrate an armed robbery, which was the object of the conspiracy. In that case the defendant was not present at the scene of the killing, and the case was submitted to the jury under instructions that they should find defendant guilty of first degree murder if they found that defendant had entered into the conspiracy and that his co-conspirator, while attempting to carry out the object of the conspiracy, shot and killed the victim. Our Supreme Court

sustained the death sentence imposed. *State v. Carey*, 288 N.C. 254, 218 S.E. 2d 387 (1975).

We are, of course, advertent to the decision of this Court in *State v. Wiggins*, 16 N.C. App. 527, 192 S.E. 2d 680 (1972), and to other cases following that decision, in which it was held that one conspirator, if not present at the scene so as to make him an aider and abettor, cannot be held liable as a principal to the substantive crime committed in furtherance of the conspiracy by his co-conspirator, but could only be held as an accessory before the fact. *See also* Note, "Criminal Conspiracy in North Carolina," 39 N. C. Law Review 422, at p. 451, et seq. However, we cannot reconcile the holding in *State v. Wiggins, supra,* with the decisions of our Supreme Court above cited, and those decisions must control our decision here.

No error.

Judges MORRIS and MARTIN concur.