STATE OF NORTH CAROLINA v. CLAUDE VANCE COOLEY

No. 7910SC1057

(Filed 1 July 1980)

1. **Criminal Law § 130 — jury tampering alleged — events not instigated by defendant**

    An order of mistrial based upon the provisions of G.S. 15A-1062 would not have been proper in this case, though there was some evidence of jury tampering, since there was no evidence of any connection between defendant or his attorney and the alleged jury tampering, and the possibility or risk that defendant might be the beneficiary of such activity was not sufficient to allow a conclusion that the acts were done at the behest of defendant or his lawyer.

2. **Criminal Law § 130 — misconduct affecting jury — events not instigated by defendant — mistrial proper**

    By the enactment of G.S. 15A-1062 and G.S. 15A-1063 the General Assembly did not intend to limit the authority of trial judges to order a mistrial where events not instigated by the defendant or his lawyer have nevertheless colored the proceedings in such a way as to suggest that an impartial trial in accordance with law cannot be had.

3. **Criminal Law § 101; Constitutional Law § 34 — jury tampering alleged — mistrial proper — retrial not denial of constitutional rights**

    Where the trial court has reasonable grounds to believe that one or more jurors have been tampered with, it has the constitutional authority, if not the duty, to stop the trial, dismiss the jury, and direct a retrial; in this case testimony by an SBI agent, though hearsay, constituted sufficient basis for the trial court to find that up to three jurors could have been tampered with, and defendant's constitutional rights were not violated where the court declared a mistrial and ordered retrial of defendant.

4. **Conspiracy § 6; Narcotics § 4 — conspiracy to sell contraband — sufficiency of evidence of conspiracy**

    In a prosecution for conspiracy to sell controlled substances, evidence was sufficient to establish a conspiracy where it tended to show a close association between defendant and his female coconspirator, defendant's presence during or assistance in telephone conversations during which drug deals were made, and defendant's active participation in various exchanges of drugs for money at which times defendant drove his coconspirator to and from the exchange site or surreptitiously was present at the time several of the exchanges occurred.

APPEAL by defendant from *Braswell and Bailey, Judges.* Order, judgments, and commitments entered 11 April 1979 and 14 June 1979 in Superior Court, WAKE County. Heard in the Court of Appeals 14 April 1980.

State v. Cooley

Defendant was charged in indictments with twenty-four counts involving the sale, possession with intent to sell, and conspiracy to sell the controlled substances cocaine and BMDA, in violation of the North Carolina Controlled Substances Act, G.S. 90-86 *et seq.* Defendant's first trial commenced at the 2 April 1979 term of court and the State rested its case on 10 April 1979. At the close of the State's evidence the trial court denied defendant's motion to dismiss, but, over defendant's objection, declared a mistrial the following day because of evidence of jury tampering. Upon retrial, the trial court submitted twelve of the indictments for the jury's consideration. Defendant was found not guilty of two of the charges and guilty of the remaining ten. From the order granting the State's motion for a mistrial ending the first trial and the judgments and commitments entered upon the jury's verdict ending the second trial, defendant appeals.

*Blanchard, Tucker, Twiggs & Denson, by Irvin B. Tucker, Jr., for the defendant appellant.*

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Jo Anne Sanford, for the State.*

WELLS, Judge.

## I. *THE MISTRIAL*

Defendant first assigns as error the action and procedure of the trial court in granting a mistrial. In pertinent part G.S. 15A-1062 provides as follows:

> § 15A-1062. Mistrial for prejudice to the State. — Upon motion of the State, the judge may declare a mistrial if there occurs during the trial, either inside or outside the courtroom, misconduct resulting in substantial and irreparable prejudice to the State's case and the misconduct was by a juror or the defendant, his lawyer, or someone acting at the behest of the defendant or his lawyer ...

Under G.S. 15A-1063:

§ 15A-1063. Mistrial for impossibility of proceeding. —
Upon motion of a party or upon his own motion, a judge may
declare a mistrial if:

    (1) It is impossible for the trial to proceed in conformi-
        ty with law; or

    (2) It appears there is no reasonable probability of the
        jury's agreement upon a verdict.

Defendant argues that G.S. 15A-1062 is inapplicable to this
case because the record is devoid of evidence that any alleged
jury tampering occurred "at the behest of the defendant or his
lawyer." The interpretation of this phrase is a question of first
impression before the appellate courts of our State. The word
"behest" has been defined as a "command", "strong often au-
thoritative request", "demand" or "urgent prompting". WEB-
STER'S THIRD INTERNATIONAL DICTIONARY 199 (1967).

After a hearing on the State's motion for a mistrial, the
trial court found, *inter alia,* that:

    10. SBI Agent Joe Momier testified in substance that
at approximately 6:55 p.m. on the evening of 10 April 1979,
that Special SBI Agent J.T. Hawthorne participated in a
meeting which took place near the intersection of Anson
and Poole Roads in Raleigh, and in the vicinity of Keith's
Grocerteria; this meeting took place as part of a special
investigation which had been requested by the under-
signed presiding judge. Mr. Momier testified that at the
conclusion of his meeting he interviewed Mr. Hawthorne
relative to the events which had just transpired. Based on
that interview Mr. Momier stated the events as follows: A
white over blue motor vehicle, Pontiac, approached Mr.
Hawthorne's location in the vicinity of the Keith's
Grocerteria, and a white female, later identified as Dorothy
Tharrington Holden, approached Mr. Hawthorne and
asked him, quote, Are you Billy Gay, close quote; Mr.
Hawthorne replied, quote, I'm Billy, close quote; there was
a discussion between them; they talked about money; the
woman offered five hundred dollars for a "no vote" and the
woman, now identified later by arrest as Dorothy Thar-

rington Holden, did thereupon pay five hundred dollars in cash money to J.T. Hawthorne, believing at that time that he was Juror Billy Gay, which money was to buy a "no vote" from Billy Gay in the trial at hand; conversation continued and Dorothy Holden assured Mr. Hawthorne that he was not the only juror who would be voting no, indicating others who were paid were a black male on the jury, and she alluded to a female having been paid; Dorothy Holden indicated that they were using their own money but that they were to be reimbursed and that, quote, he, close quote, had already reimbursed them for monies they had paid and spent for this in the past.

The court took judicial notice that the defendant on trial is a male person. Conversation also included references to a telephone call to Billy Gay at an earlier time in the trial, but Mr. Hawthorne denied having received such a call. Dorothy Holden also referred to the activity which was then taking place between herself and Mr. Hawthorne as a very serious matter, jury tampering. A white male, later identified as Rufus Wade Holden, Sr., was in the above described Pontiac and was observed by Mr. Hawthorne to hand Dorothy Holden what appeared to be cash before Dorothy Holden delivered the five hundred dollars to Mr. Hawthorne and after they had agreed upon that price. When Rufus Holden was later arrested, shortly thereafter, he was found to have had an additional sum of one thousand two dollars in cash on his person.

11. From his own experience, participation and observation, Mr. Momier testified that six SBI Agents maintained surveillance on this meeting and observed the two Holden subjects to enter their Pontiac and leave the area of the meeting with Mr. Hawthorne, and that the Holdens went to the area of Longview Shopping Center where the Holdens were detained and each were [sic] placed under arrest.

12. Formal criminal charges were placed against Dorothy Tharrington Holden and Rufus Wade Holden, Sr., as shown in criminal warrants in court's Exhibits 2

through 8, inclusive, which exhibits were introduced by the State.

Our examination of the record reveals these findings to be supported by the evidence. The court concluded that the jury tampering was attempted "in favor of" and for the "benefit" of the defendant, who "would have been the direct and only beneficiary" of such a scheme.

[1] The statute, G.S. 15A-1062, is based almost verbatim on Rule 541(b) of the Uniform Rules of Criminal Procedure, [1] which was in turn derived from the Idaho and New York rules. [2]

---

[1]    Rule 541 of the Uniform Rules of Criminal Procedure provides:

\* \* \*

(b) For prejudice to State. Upon motion of the State, the court may declare a mistrial if there occurs during the trial, either inside or outside the courtroom, misconduct by the defendant, his lawyer, or someone acting at the behest of the defendant or his lawyer, resulting in substantial and irreparable prejudice to the State's case . . . .

[2]    Rule 29.1 of the Idaho Rules of Criminal Procedure states:

Section 280.10 of the New York Law of Criminal Procedure provides:

Motion for mistrial. — At any time during a trial, the court may declare a mistrial and order a new trial of the indictment, information or complaint under the following circumstances:

Motion for mistrial. At any time during the trial, the court must declare a mistrial and order a new trial of the indictment under the following circumstances:

\* \* \*

\* \* \*

(b) Upon motion of the state, when there occurs during the trial, either inside or outside the courtroom, misconduct by the defendant, his attorney or attorneys, or some other person acting on his behalf resulting in substantial prejudice to the state's case. . . .

2. Upon motion of the people, when there occurs during the trial, either inside or outside the courtroom, gross misconduct by the defendant or some person acting on his behalf, or by a juror, resulting in substantial and irreparable prejudice to the people's case . . . .

(c) Upon motion of either party or upon the court's own motion, when it is impossible to proceed with the trial in conformity with law.

3. Upon motion of either party or upon the court's own motion, when it is physically impossible to proceed with the trial in conformity with law.

State v. Cooley

Official Commentary to Rule 541(b), Uniform Rules of Criminal Procedure (1974).[3] We believe that the restrictive wording of G.S. 15A-1062 renders the statute inapplicable to this case.[4]

Clearly, the word "behest", implies, at the minimum, that there necessarily be some sort of action or conduct on the part of the defendant or his attorney inducing or prompting the alleged misconduct. There was no evidence here of any connection between the defendant or his attorney and the alleged jury tampering activities of the Holdens. The possibility — or risk — that the defendant might be the beneficiary of such activity is not sufficient to allow us to conclude that these acts were done at the behest of the defendant or his lawyer, and we therefore conclude that an order of mistrial based upon the provisions of G.S. 15A-1062 would not have been proper in this case.

Defendant also argues that the trial court lacked authority to order a mistrial under G.S. 15A-1063(1) for impossibility of proceeding in conformity with law. The trial court concluded that, "in the opinion of this court it is impossible to proceed with the trial of the defendant, Claude Vance Cooley, in conformity with the law" and that it is necessary that a mistrial be de-

---

[3]  It is interesting to note that the Idaho and New York rules upon which the Uniform Rule was based both permit the court to declare a mistrial when the misconduct which resulted in substantial and irreparable prejudice to the State was caused by persons merely acting on the defendant's *behalf*. Presumably, under these statutes no prompting need be shown on the part of the defendant or his attorney which induced other persons to engage in the misconduct.

[4]  Professor Billings has suggested that the North Carolina rule was adopted soon after the opinion handed down by the Supreme Court of the United States in *United States v. Jorn*, 400 U.S. 470, 27 L.Ed. 2d 543, 91 S.Ct. 547 (1971), which purported to limit severely a court's authority to retry a defendant after a mistrial to which the defendant had objected or refused to consent. However, from the Court's subsequent opinions it became evident that such severe restrictions would not be applied. The result has been that North Carolina has codified a rule more restrictive than that previously imposed on a constitutional basis by the Supreme Court of the United States or the courts of our State. Billings, *Contempt, Order in the Courtroom, Mistrials*, 14 WAKE FOREST L.REV. 909, 948 (1978). Of course, we are bound to follow the policy decisions of our Legislature where they afford greater rights to the accused than those provided by our Constitution.

clared "to attain the ends of justice and the integrity of any ultimate jury verdict, regardless of whatever the verdict might be."

There is little question that G.S. 15A-1063(1) was intended to continue the North Carolina practice of allowing a mistrial when it becomes physically necessary to do so. The Official Commentary to G.S. 15A-1063 provides:

\* \* \*

If the prejudice were so total as to make it "impossible" for the trial to proceed "in conformity with law," then either party or the judge on his own motion could trigger the mistrial under subdivision (1) of this section — provided this would be constitutional.

In its deliberations the Commission was furnished the following draftman's comment with this section: ... *(This subparagraph gives) the judge as broad and flexible a power as possible in impossibility cases consistent with the constitutional rulings concerning former jeopardy.*" [Emphasis added.]

*See also*, Billings, *Contempt, Order in the Courtroom, Mistrials*, 14 WAKE FOREST L. REV. 909 (1978). Physical impossibility of trial has been held to occur in North Carolia in situations such as where a juror became intoxicated, *State v. Tyson*, 138 N.C. 627, 50 S.E. 456 (1905); insane, *State v. Beal*, 199 N.C. 278, 154 S.E. 604 (1930); or ill, *State v. Ledbetter*, 4 N.C. App. 303, 167 S.E. 2d 68 (1969); or upon the illness or incapacity of the judge, *State v. Boykin*, 255 N.C. 432, 121 S.E. 2d 863 (1961); or codefendant, *State v. Battle*, 267 N.C. 513, 148 S.E. 2d '599 (1966).

Prior to the enactment of G.S. 15A-1063 (effective 1 July 1978), our courts had approved the granting of a mistrial, over a defendant's objection, for "the necessity of doing justice." *State v. Shuler*, 293 N.C. 34, 235 S.E. 2d 226 (1977). In *Shuler* our Supreme Court held that the trial court properly granted the State's motion for a mistrial where a law enforcement officer had commented in the presence of the jury that the State's case

was weak. The rule has never permitted the granting of a mistrial simply upon a whim or at the trial court's unbridled discretion, but has carefully limited the circumstances when it is permissible. Justice (later Chief Justice) Bobbitt has explained:

> It will be observed that "the necessity of doing justice" is not an expression connoting a vague generality but one that relates to a limited subject, namely, the occurrence of some incident of a nature that would render impossible a fair and impartial trial *under the law*. [Emphasis added.]

*State v. Crocker*, 239 N.C. 446, 450, 80 S.E. 2d 243, 246 (1954). The Court, quoting from *State v. Wiseman*, 68 N.C. 203, 206 (1873), a jury tampering case, stated that the necessity of doing justice, "arises from the duty of the court to 'guard the administration of justice from fraudulent practices; as in the case of tampering with the jury, or keeping back the witnesses on the part of the prosecution.' " *Id.* Thus, when jury tampering has occurred, a case may no longer proceed "in accordance with law."

[2] The question then becomes whether by the enactment of G.S. 15A-1062 and G.S. 15A-1063 the General Assembly intended to limit the authority of trial judges to order a mistrial where events not instigated by the defendant or his lawyer have nevertheless colored the proceedings in such a way as to suggest that an impartial trial in accordance with law could not be had. Professor Billings has commented that since there was no evidence in *Shuler* that the deputy sheriff who made his comment to a juror had done so at the behest of the defendant or his lawyer, a trial court acting on this set of facts could not now declare a mistrial under G.S. 15A-1062. Billings, *Contempt, Order in the Courtroom, Mistrials*, 14 WAKE FOREST L. REV. 909, 945 (1978). However, we do not understand this argument to preclude a court from granting a mistrial on these facts under G.S. 15A-1063(1), where it could reasonably conclude that a fair and impartial trial in accordance with law could not be had. As we view the language of these sections, the draftman's comments, and the prior case law of this State, we do not believe the General Assembly intended to so limit the authority of trial judges to require that jury trials in criminal cases be free of

improper influence. We believe the General Assembly intended to permit trial judges to grant mistrials in cases such as the one *sub judice* under G.S. 15A-1063(1), if constitutionally allowable.

[3] We next address the question of the constitutionality of retrying the defendant after the trial court's action granting a mistrial in the earlier proceedings. We recognize that the Double Jeopardy Clause of the Fifth Amendment[5] precludes retrial of a defendant in some circumstances where the proceedings are terminated prior to judgment.[6] *Arizona v. Washington*, 434 U.S. 497, 54 L.Ed. 2d 717, 98 S.Ct. 824 (1978). The interest of the accused which is protected in such cases is his right to retain a given tribunal. *Crist v. Bretz*, 437 U.S. 28, 57 L.Ed. 2d 24, 98 S.Ct. 2156 (1978); In the Matter of Hunt and In the Matter of Dowd, 46 N.C. App. 732, 266 S.E. 2d 385 1980.

Other circumstances, however, may control. A defendant's "valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Arizona v. Washington, supra*, 434 U.S. at 505, 54 L.Ed. 2d at 728, 98 S.Ct. at 830. *Accord, Illinois v. Somerville*, 410 U.S. 458, 35 L.Ed. 2d 425, 93 S.Ct. 1066 (1973). In *Washington*, the trial court had granted a mistrial on grounds of prejudicial remarks made by the defendant's attorney during his opening statement. The Court stated that when the prosecution seeks a mistrial, it has the burden of showing a high degree of necessity, although the trial court's decision to declare a mistrial is entitled to substantial deference. *Accord, Gori v. United States*, 367 U.S. 364, 6 L.Ed. 2d 901, 81 S.Ct. 1523 (1961). The Court in *Washington* commented that, "[n]either

---

[5]   The Law of the Land Clause of the North Carolina Constitution, N.C. Const. art. 1, § 19, has also been held to embrace the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. *State v. Cameron*, 283 N.C. 191, 195 S.E. 2d 481 (1973).

[6]   This principle represents a departure from the English and early American practice in which the bar of double jeopardy could only be asserted on the basis of an actual verdict of acquittal or conviction. *See, Crist v. Bretz*, 437 U.S. 28, 57 L.Ed. 2d 24, 98 S.Ct. 2156 (1978) (Powell, J., dissenting).

party has a right to have his case decided by a jury which may be tainted by bias . . . ." 434 U.S. at 516, 54 L.Ed. 2d at 734-735, 98 S.Ct. at 835-836. In quoting from *United States v. Morris*, 26 F. Cas. 1323, 1328 (C.C. Mass. 1851) (No. 15815), the Court held that "neither party 'can have a vested right to a corrupt or prejudiced juror, who is not fit to sit in judgment in the case.' " *Id.*, n. 36, 434 U.S. at 516, 54 L.Ed. 2d at 735, 98 S.Ct. at 836. Similarly, in *Illinois v. Somerville, supra,* 410 U.S. at 470, 35 L.Ed. 2d at 434, 93 S.Ct. at 1073 the Court, quoting from *Wade v. Hunter*, 336 U.S. 684, 689, 93 L.Ed. 974, 978, 69 S.Ct. 834, 837 (1949), stated:

> [T]here have been instances where a trial judge has discovered facts during a trial which indicated that one or more members of the jury might be biased against the Government or the defendant. It is settled that the duty of the judge in this event is to discharge the jury and to direct a retrial.

*Accord, State v. Shuler*, 293 N.C. 34, 235 S.E. 2d 226 (1977). We believe the law is clear that where the trial court has reasonable grounds to believe that one or more jurors have been tampered with, it has the constitutional authority, if not the duty, to stop the trial, dismiss the jury, and direct a retrial.

Defendant argues that his rights to due process of law, confrontation of witnesses, and the effective assistance of counsel were violated by the manner in which the trial court conducted its investigation to determine whether there had been attempts made on behalf of the defendant to bribe jurors. We do not agree. In open court the parties stipulated that after the State had rested its case during the first trial the following events occurred:

> 1. That at the close of court on April 10th, 1979, the judge requested all counsel to meet him in his chambers at 8:30 a.m. on April 11, 1979.

> 2. That shortly before the meeting in chambers on April 11th, 1979, the judge had a brief conference with Assistant District Attorney Jack Hall and SBI Agents Joe Momier and Terry Turbeville.

3. That at or about 8:30 a.m. the judge called all counsel into chambers. Present were Judge E. Maurice Braswell, Assistant District Attorneys Jack Hall and Narley Cashwell, Defense Counsel Irvin B. Tucker, Jr., and W.G. Ransdell, Jr., SBI Agents Joe Momier and Terry Turbeville.

4. That at the conference in chambers Judge Braswell initially advised defense counsel that there was evidence that one and maybe as many as three jurors may have been contacted about voting not guilty in the cases on trial and that it looked like (*sic*) we are probably in a mistrial situation.

5. Defense counsel requested to be advised of the nature of the evidence and pursuant to the judge's request, Jack Hall and Joe Momier disclosed the events that had occurred the prior evening involving a meeting between SBI Agent J.T. Hawthorne and one Dorothy Holden, and others, which events Joe Momier later testified to in court. The defense counsel were not furnished any evidence concerning alleged jury tampering, other than that later testified to in court by Mr. Joe Momier.

6. That the judge and Mr. Hall stated that there was other evidence concerning alleged jury tampering that was not and would not be disclosed because the investigation was ongoing and such disclosure might jeopardize that investigation.

7. That defense counsel advised all present that they had no knowledge of or information about any attempt to tamper with any juror.

8. At the opening of court the State made a motion for mistrial pursuant to 15A-1062 and called Joe Momier in support of that motion. That defense counsel, while cross examining Mr. Momier, asked him the following questions, quote, "Well, do you have any other evidence of contact with any jurors on this case other than what you've — testified

State v. Cooley

to?" Before the witness answered the question the judge asked counsel to come to the bench, par 9.

9. Before the witness answered the question the judge asked counsel to come to the bench. At the bench conference the judge advised counsel that he would not require the witness to answer the question because the investigation was ongoing and the disclosure might jeopardize the investigation. Defense counsel responded that they were completely in the dark as to what the evidence of jury tampering might be and that they considered it necessary to make a record of that evidence.

10. The Judge then requested that all counsel meet him in his chambers and when in chambers the judge repeated that he would not require the witness to answer the questions because the investigation was ongoing and repeated again that there was evidence which would not be disclosed to defense counsel because such disclosure could jeopardize the investigation. Defense counsel repeated their feeling of a need to make a reviewable record and discussed with those present — the presiding judge, Mr. John T. Hall and Mr. Narley Cashwell of the District Attorney's Office — any alternative ways of making a record that would not jeopardize the ongoing investigation. No way was found to preserve in the court records that information which the investigators had concerning possible jury tampering or attempted jury tampering without such preservation jeopardizing the ongoing investigation and defense counsel withdrew the question to Mr. Momier.

The parties also stipulated that at the time the trial court ruled on the State's motion for a mistrial, he did not have before him the transcript of interviews with the jurors, in which all of the jurors stated that they had not been contacted or bribed.

We hold that the previously quoted testimony of Agent Momier constitutes a sufficient basis for the trial court to have found that up to three jurors could have been tampered with in this case. Momier stated that Agent Hawthorne had been given $500 for a "no vote" by persons later identified as Dorothy and

State v. Cooley

Rufus Holden, who believed Hawthorne to be juror Billy Gay. According to Momier, Hawthorne was told by the Holdens that he would not be the only person voting in the negative, indicating that a black male and a female had also been paid. The Holdens were later arrested for jury tampering.[7]

We further hold that as long as a reasonable basis appeared in the record for the court's reliance on Agent Momier's testimony, it is not significant that *in this hearing on the State's motion for a mistrial,* the testimony pertaining to what Agent Hawthorne[8] said was hearsay and may have been inadmissible at trial. This testimony was given in the presence of defense counsel, who was allowed to cross-examine the witness.[9] Here, we are dealing with the testimony of an agent of the State Bureau of Investigation as to what he was told to be the personal observation of another named SBI agent. We cannot say that the trial court's reliance upon this detailed testimony was unreasonable, especially in light of the substantial deference which we must afford a trial court's decision declaring a mistrial on grounds of possible jury bias. *Arizona v. Washington,* 434 U.S. 497, 54 L.Ed. 2d 717, 98 S.Ct. 824 (1978); *State v. Shuler,* 293 N.C. 34, 235 S.E. 2d 226 (1977). Nor do we believe that it was error for the trial court to have ruled on the motion prior to

[7]   The fact that arrest warrants were issued against the Holdens also lends credence to the reasonableness of the court's belief that jury tampering may have occurred. An arrest warrant may only be issued by a judicial official upon a showing of probable cause. G.S. 15A-304(d); *State v. Harvey,*281 N.C. 1, 187 S.E. 2d 706 (1972).

[8]   The record shows only that Agent Hawthorne was not available to attend the hearing.

[9]   The defendant argues that its questioning of Agent Momier was inhibited by statements made by the trial court that such questioning might jeopardize the ongoing investigation into the alleged jury tampering, which was proceeding at that time. We do not understand the trial court to have done any more than caution the defendant's counsel about the investigation. At no point did the court decline to allow defendant's attorney to ask any question. The testimony of Agent Momier, given in the presence of defendant's counsel and subject to their cross-examination, was the basis for the court's findings of fact. Clearly then; this information was not adduced during a prohibited ex parte investigation, as alleged by defendant. *See, State v. Crocker,* 239 N.C. 446, 80 S.E. 2d 243 (1954).

State v. Cooley

having considered the testimony of the jurors. It could hardly be expected that jurors who may have accepted payoffs would have freely disclosed such circumstances. For this reason, their testimony was far from conclusive, and would have been of only limited value to the court. [10]

## II. *THE TRIAL*

Defendant was originally charged in indictments with twenty-four counts. Two of these counts related to the conspiracy to sell BMDA and cocaine with Teresa Ray, Brenda Johnson, C.J. Overton and C.R. Kimrey. Sixteen counts concerned the sale or possession with intent to sell or deliver cocaine or BMDA through Brenda Johnson. Six counts related to the sale or possession with intent to sell or deliver cocaine or BMDA through Teresa Ray. The trial court submitted to the jury only the eighteen counts concerning the conspiracy, sale, or possession with intent to sell involving Brenda Johnson. The jury determined that defendant was not guilty of two counts pertaining to the sale and possession with intent to sell BMDA on 30 August 1978. The jury found defendant guilty of all the remaining charges. There was no evidence that any drugs were at any time in the actual possession of defendant. Defendant does not maintain that there was insufficient evidence of Brenda Johnson's possession or sale of the drugs on the dates alleged in the indictments. Rather, it is defendant's position that the State failed to show through evidence aliunde that defendant was involved in a conspiracy with her. The defendant argues that he

---

[10] The situation here is clearly distinguishable from that present in *United States v. Jorn*, 400 U.S. 470, 27 L.Ed. 2d 543, 91 S.Ct. 547 (1971), cited by the defendant. In *Jorn* the trial judge ordered a mistrial when he decided that some of the government's witnesses who might incriminate themselves should not be permitted to testify until they had been counselled by attorneys. The Supreme Court held that there was no necessity for a mistrial because of the availability of a continuance. Thus, in *Jorn*, the reason the trial court's failure to consider a continuance was held to be determinative was that such a continuance would have cured the problem — the witnesses could have consulted counsel. In the present case, however, the juror's testimony which could have been procured during a continuance would, as stated previously, have been of questionable value. Additionally, once the jurors had been questioned about having received bribes, the probability was increased that they became tainted against the accused.

therefore cannot be held to have constructively possessed or sold any of the drugs so possessed and delivered by Johnson, and that his motion to dismiss at the close of the State's evidence should have been allowed.

A conspirator is liable for all of the unlawful acts of his coconspirators committed in furtherance of the conspiracy regardless of whether he was present at the time such illegal acts were committed. *State v. Grier*, 30 N.C. App. 281, 227 S.E. 2d 126 (1976), *cert. denied*, 291 N.C. 177, 229 S.E. 2d 691 (1976). However, before the acts or declarations of coconspirators may be considered as evidence against the conspirator there must be a showing, through evidence independent of the coconspirators' acts or declarations, that a conspiracy existed, that the acts or declarations were made by a party to it in pursuance of its objectives, and that the acts or statements were made while the conspiracy was active. *State v. Tilley*, 292 N.C. 132, 232 S.E. 2d 433 (1977). Independent proof of the existence of a conspiracy may be provided solely by circumstantial evidence. *State v. Horton*, 275 N.C. 651, 170 S.E. 2d 466 (1969), *cert. denied*, 398 U.S. 959, 26 L.Ed. 2d 545, 90 S.Ct. 2175 (1970), *rehearing denied*, 400 U.S. 857, 27 L.Ed. 2d 97, 91 S.Ct. 25 (1970). In the great majority of conspiracies circumstantial evidence is the only mode of proof available. *State v. Smith*, 237 N.C. 1, 74 S.E. 2d 291 (1953).

> Direct proof of the charge is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy. [Citation omitted.]

*State v. Whiteside*, 204 N.C. 710, 712, 169 S.E. 711, 712 (1933); *accord, State v. Grier, supra*. The State's theory of the case is that the defendant's knowledge of and participation in the conspiracy has been shown through circumstantial evidence.

[4] Upon motion for a nonsuit in a criminal action, the court must consider the evidence in the light most favorable to the State, and resolve all contradictions and discrepancies in its favor, giving it the benefit of every reasonable inference which

can be drawn from the evidence. *State v. Abernathy*, 295 N.C. 147, 244 S.E. 2d 373 (1978). In the present case it is undisputed that defendant and Brenda Johnson lived close to one another and were lovers. The record is replete with conversations and transactions which occurred between Johnson and undercover agents Kimrey and Overton of the State Bureau of Investigation involving the purchase of pills and cocaine. The record contains evidence that a conspiracy to sell cocaine and BMDA existed between Johnson and defendant as early as 10 September 1978. On this date Agent Kimrey had a telephone conversation with Johnson during which the sale of pills and cocaine was discussed. Agent Kimrey asked Johnson when she had tried to contact her, and Johnson asked someone in close proximity to her, "Uh, C.V., when did I — what day was it I called that girl to see if she wanted any more of those pills?" Agent Kimrey said that later during the conversation she heard a male voice in the background and Johnson stated, "He just said, you know, if you want it you could pay [for the drugs] with a check or cash." On two occasions during the conversation Johnson used the initials C.V., those of the defendant. These statements are not hearsay and are thus admissible against defendant because they are offered merely to show the presence of the defendant, not to prove the truth of what the matter stated. *State v. Greene*, 30 N.C. App. 507, 227 S.E. 2d 154 (1976); 1 Stansbury's N.C. Evidence § 141, p. 467 (Brandis rev. 1973). Johnson frequently referred to her boyfriend as "C.V."

Independently of the above statements there was sufficient evidence linking defendant to the conspiracy. On 18 September 1978 Agent Kimrey and Brenda Johnson arranged to meet in the restroom of a Raleigh lounge for the purchase of $2,000 worth of cocaine. Johnson was driven by defendant on a motorcycle to the lounge. Two minutes after Johnson entered the lounge, defendant entered. After the sale occurred, defendant and Johnson left the lounge and rode away on the motorcycle. On 2 October 1978 Agents Kimrey and Overton again agreed with Johnson to a sale of BMDA and cocaine. The exchange was to occur at a shopping center parking lot in Raleigh. A car driven by defendant entered the shopping center and parked. Then a vehicle driven by Johnson entered the parking lot, and the sale was completed. Johnson drove her vehicle out of the

parking lot, and defendant drove off. Again on 6 October 1978 another drug purchase was arranged between the SBI agents and Johnson at a shopping center parking lot in Raleigh. This time defendant and Johnson drove to the center together. Both exited defendant's vehicle, defendant walking into a fast-food restaurant and Johnson entering the undercover vehicle. Five minutes later defendant left the parking lot. Johnson drove in the undercover vehicle with the agents to another shopping center at which her car was located, and the sale occurred there.

We hold that in this testimony there is sufficient independent evidence from which a jury could reasonably infer that defendant and Brenda Johnson conspired to sell controlled substances. The instant case is similar to *State v. Abernathy*, 295 N.C. 147, 244 S.E. 2d 373 (1978), in which the only evidence against one of the accused coconspirators was testimony showing circumstances from which it could be inferred that he knew of his codefendants' plans to rob a certain residence and that he assisted in the robbery by driving the other defendants to and from the scene of the crime. *Accord, State v. Covington*, 290 N.C. 313, 226 S.E. 2d 629 (1976). In the present action the State's case against defendant rests, in essence, on the close association between defendant and Brenda Johnson, defendant's presence during or assistance in telephone conversations during which drug deals were made, and his active participation in various exchanges of drugs for money at which times he drove Brenda Johnson to and from the exchange site or surreptitiously was present at the time several of the exchanges occurred.[11]

Since we have found that the independent evidence established a *prima facie* case of conspiracy, all of the evidence of Brenda Johnson's actions and statements in furtherance of the conspiracy which occurred during the conspiracy were properly

[11] This evidence of a close and personal involvement of the defendant in Johnson's drug dealings distinguishes the present action from the cases cited by defendant, *e.g., State v. Carey*, 285 N.C. 497, 206 S.E. 2d 213 (1974); *State v. Benson*, 234 N.C. 263, 66 S.E. 2d 893 (1951); *United States v. Gutierrez*, 559 F. 2d 1278 (5th Cir. 1977). Of course, insofar as the Federal cases cited by defendant are not constitutionally based, they are not authoritative on the North Carolina law of conspiracy.

admitted against the defendant by the trial court. *State v. Miley*, 291 N.C. 431, 230 S.E. 2d 537 (1976); *State v. Covington, supra.* Accordingly, the trial court properly submitted the remaining charges pending against the defendant to the jury. We have examined defendant's other assignments of error and have found them to be without merit.

No error.

Chief Judge MORRIS and Judge PARKER concur.